IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 20, 2013 Session

# HARDEMAN COUNTY v. JUDY I. MCINTYRE, ET AL.

**Direct Appeal from the Circuit Court for Hardeman County**
**No. 08-02-0331/08-02-0351    J. Weber McCraw, Judge**

---

**No. W2012-01690-COA-R3-CV - Filed March 27, 2013**

---

This case concerns the liability for a collision involving a vehicle operated by one of the appellees and an ambulance operated by the appellant county. After a bench trial, the trial court awarded damages to appellee driver against the appellant. After a thorough review of the record, we reverse and remand.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,W.S., and HOLLY M. KIRBY, J., joined.

James I. Pentecost and Melissa K. Van Pelt, Jackson, Tennessee, for the appellants, Hardeman County, Tennessee and Hardeman County Emergency Medical Services.

David A. Stowers and Stephen L. Hale, Bolivar, Tennessee, for the appellees, Judy McIntyre and Billy McIntyre.

Jay G. Bush, Jackson, Tennessee, for the appellee, Judy I. McIntyre.

## OPINION

## I. Background

On August 14, 2007, Appellant Hardeman County Emergency Medical Services ("Ambulance Service") employees Derrick Love and Jennifer Fortune were involved in an automobile accident while responding to an emergency call in Whiteville, Tennessee. The Ambulance Service is operated by Appellant Hardeman County, Tennessee ("Hardeman County," and together with Ambulance Service, "Appellants").

At the time of the accident, the ambulance was traveling westbound on two-lane Tate Road, through several curves, approaching the turn off to Jones Road. There is no stoplight or stop sign on Tate Road at the turn off to Jones Road. The ambulance decelerated upon seeing at least two cars stopped on Tate Road preparing to turn left onto Jones Road. After the first car, a pickup truck, turned left, the ambulance proceeded to cross the double yellow line on Tate Toad and merged into the left lane, in an attempt to go around the car that remained stopped on Tate Road. As the ambulance was passing the stopped car, a Town Car, the car's driver, Appellee Judy I. McIntyre, attempted to turn left onto Jones Street, colliding with the ambulance. Both the ambulance personnel and Ms. McIntyre sustained injuries in the collision.

On June 5, 2008, Hardeman County filed a complaint against Ms. McIntyre for damages arising from the collision, including property damage and medical expenses for the ambulance personnel that were incurred by Hardeman County. On August 6, 2008, Ms. McIntyre and her husband filed a separate complaint for damages against Hardeman County, ambulance driver Derrick Love, and the Ambulance Service. The two cases were consolidated by agreement of the parties on September 29, 2011.

A bench trial was held on May 15, 2012. The parties stipulated to the medical expenses of both parties and the property damage to Hardeman County. The first witness to testify was Annette Anderson. Ms. Anderson was driving the pickup truck in front of Ms. McIntyre's car that turned left onto Jones Road prior to the collision. Ms. Anderson testified that the accident occurred during daylight and there were no adverse conditions on the road, such as rain or snow. She further testified that the ambulance had engaged both its emergency lights and siren throughout the events at issue in this case, and that she clearly heard and saw the ambulance prior to the collision. According to Ms. Anderson, she proceeded to turn onto Jones Road because the ambulance was far enough away at that time that she could safely make the turn. Ms. Anderson testified that, when she observed the ambulance, it was going "fast"and "quick" down Tate Road westbound toward the turn off at Jones Road. However, Ms. Anderson further testified that, after she turned onto Jones Road, she did not observe the ambulance again and admitted that she had no "knowledge of how fast the ambulance was going." Instead, she testified that shortly after turning on Jones Road, she heard the sound of a collision, pulled her car to the side of the road, exited the car and saw that the Town Car and the ambulance had collided.

Jennifer Fortune, an emergency medical technician with the Ambulance Service also testified as to the circumstances surrounding the collision. Prior to the collision, the ambulance was traveling down Jones Road in response to an emergency call regarding a possible drug overdose in Whiteville, Tennessee. Ms. Fortune testified that Tate Road

contains several curves, but that the portion of the road immediately proceeding the turn off to Jones Road is a "straight away." According to Mr. Fortune, who was a passenger in the ambulance, the ambulance decelerated upon approaching the turn off to Jones Road until the pickup truck turned, then proceeded to clear the intersection. As the ambulance was going through the intersection, however, the Town Car turned left, colliding with the ambulance and pushing it into a fire hydrant. Ms. Fortune testified that the ambulance's lights and siren were engaged the entire time and that the Town Car did not have a blinker on indicating its intent to turn left. Ms. Fortune described the ambulance's movement at the turn off, stating that it "approached [the turn off] still using lights, and sirens are still running, we yielded, [and] proceeded around [Ms. McIntyre's Town Car] with caution." According to Ms. Fortune, when the driver of the ambulance became aware that Ms. McIntyre was proceeding to turn left, he attempted to accelerate to prevent a collision. However, his attempt was unsuccessful. Ms. Fortune further testified that she was unsure of the exact rate of speed the ambulance was traveling down Tate Road, but that she was sure that the ambulance was not exceeding fifteen miles per hour over the posted speed limit, which is the Ambulance Service's internal policy limit for speed in an emergency situation. Ms. Fortune was also unsure of the exact speed limit on Tate Road where the accident occurred, but testified that she believed the speed limit to be thirty-five miles per hour. Ms. Fortune further testified that the ambulance was not required by internal policy to stop at the turn off to Jones Road because the turn off was not a true intersection.

Ms. McIntyre testified, in contrast, that she is usually in the habit of using her turn signal at the turn off to Jones Road and that she travels this same path every day that she goes into work. Ms. McIntyre believed that she had used her blinker on the day of the collision as was her usual habit. Ms. McIntyre testified that prior to the collision, she heard the ambulance siren, but after looking in all directions, was unable to locate the ambulance. According to Ms. McIntyre, she could also no longer hear the siren and she believed that the ambulance personnel had "turned [the siren] off." Ms. McIntyre admitted, however, that she was listening to the radio at the time and did not turn the radio down despite hearing the siren. Because she could neither hear nor see the ambulance approaching, Ms. McIntyre proceeded to execute a left-hand turn onto Jones Road, resulting in the collision. According to Ms. McIntyre, she never saw the ambulance and was, therefore, unable to speculate as to the ambulance's speed. Ms. McIntyre was taken by another ambulance to a hospital. She testified, over objection, that while she was in the emergency room, she overheard the ambulance driver admit to a police officer that he was driving approximately eighty miles per hour prior to the collision. Ms. McIntyre also alleged that the ambulance driver stated that both his lights and siren were on and that he believed that Ms. McIntyre had yielded to the ambulance prior to attempting to pass her Town Car. The police officer allegedly responded that he would falsify the police report to state that the ambulance was only traveling forty miles per hour. Ms. McIntyre admitted, however, that she never saw the

alleged speakers at the hospital, that she had never met either the ambulance driver or the police officer, that she was not familiar with either speaker's voice, and that the police report at issue did not contain a speed at which the ambulance was traveling. Although the ambulance driver was named as a defendant in the complaint, it appears from the record that he was never served with process, nor did he participate in any way in the proceedings. Neither the ambulance driver nor the police officer was called to testify.

Several photographs depicting the damage to Ms. McIntyre's car were also admitted into evidence without objection. The photographs show extensive damage to the driver's side and front of Ms. McIntyre's car. Ms. McIntyre further testified that she suffered various injuries, including a broken collar bone, four broken ribs, internal bruising, and an ankle injury as a result of the crash. According to Ms. McIntyre, although she healed from the majority of her injuries in approximately four months, she had lingering pain for a year after the accident.

Finally, Lela Ashworth, Ms. McIntyre's sister, testified about a conversation she had with Ms. Fortune at the hospital after the accident. According to Ms. Ashworth, she was called to the hospital due to her sister's accident. At the hospital, Ms. Ashworth spoke with Ms. Fortune, who allegedly informed Ms. Ashworth that the ambulance had been traveling at eighty miles per hour prior to the collision, but "slowed down" before the accident occurred. Ms. Ashworth testified, however, that Ms. Fortune did not state what speed the ambulance was going at the time of the collision. In her previous testimony, however, Ms. Fortune denied that she told anyone that the ambulance was traveling eighty miles per hour. In addition, Ms. Fortune testified that she never heard Mr. Love or any one else state that the ambulance was going eighty miles per hour.

At the conclusion of the evidence, the trial court made oral findings of fact and conclusions of law. In pertinent part, the trial court found:

> First of all, there's a lot of argument about the speed of the ambulance. The Court does not find that the ambulance was traveling at 80 miles per hour. Although the Court does find that based on the photographs that the ambulance was traveling at a pretty good rate of speed, because there is substantial impact according to the photographs.
> The Court also finds that Ms. McIntyre testified that she heard the ambulance and then it was cut off, and she looked around and didn't know where it was. And then there was testimony later that she had a radio on listening to gospel music.
> You know, the court kind of wonders if you had heard a

-4-

siren and didn't know where it was, why you would have the radio on, why you would not just pull to a stop or to the side of the road until you could locate the source of the siren, to locate the ambulance, so I'm a little troubled by that.

The Court is going to ultimately find that the ambulance driver was 60 percent at fault based on his disregard for possible results and the safety of all persons. Even though he does have the ability to pass cars, cross double yellow lines, to make emergency maneuvers, he still needs to do so with regards to safety for all persons.

And, again, based on impact, it appears that he should have lowered his speed as he maybe passed which is an appropriate pass. He must do so with due caution.

Again, the Court finds that Ms. McIntyre is 40 percent at fault because she heard the ambulance yet she did not take due care to locate where it was. She did not take the due care to turn her radio off or even lower the windows to locate the source of this.

So the Court finds that she's partially at fault as well with regards to the damages to the automobile. . . .

The trial court went on to award Ms. McIntyre damages for lost wages, medical expenses, and pain and suffering. The judgment totaled $86,488.13, which was to be reduced by Ms. McIntyre's own percentage of fault. The trial court entered an order memorializing its ruling from the bench on June 29, 2012. The trial court's oral ruling was incorporated by reference into the order. Appellants filed a timely notice of appeal. After receiving the record, however, this Court concluded that the order entered was not a final order because it did not adjudicate Ms. McIntyre's claim against ambulance driver Derrick Love. Accordingly, this Court entered an order on October 29, 2012 directing the trial court to enter a final order adjudicating this claim. On November 14, 2012, the trial court entered an order dismissing Ms. McIntyre's claim against Mr. Love, noting that Mr. Love was never served, and therefore was never properly before the Court. The trial court also specifically noted that it had denied any claims for property damage asserted by Ms. McIntyre.

## II. Analysis

Appellants raise a number of issues in their appellate brief; however, from our review of the record and the parties' briefs, we discern the dispositive issue in this case to be whether Ms. McIntyre proved a breach of the standard of care on the part of the Ambulance Service. Because this case was tried by the trial court, we review the trial court's findings

of fact *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). No presumption of correctness, however, attaches to the trial court's conclusions of law and our review is *de novo*. ***Blair v. Brownson***, 197 S.W.3d 681, 684 (Tenn. 2006) (citing ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000)).

Both Ms. McIntyre's and Hardeman County's claims against each other are based on theories of negligence. The *prima facie* elements of negligence are as follows:

> In order to establish a prima facie claim of negligence, basically defined as the failure to exercise reasonable care, a plaintiff must establish the following essential elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal cause.

***Giggers v. Memphis Hous. Auth.***, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting ***McCall v. Wilder***, 913 S.W.2d 150, 153 (Tenn. 1995)). Appellants essentially argue that Ms. McIntyre failed to prove that they breached the duty of care in operating the ambulance at the time of the collision. With respect to the breach of duty element of a claim for negligence, our Supreme Court has held:

> Assuming a duty is owed, it must be determined whether defendant has exercised reasonable care under the circumstances. If defendant has not, the duty has been breached. In this regard, we have observed that "[t]he term reasonable care must be given meaning in relation to the circumstances. Ordinary, or reasonable, care is to be estimated by the risk entailed through probable dangers attending the particular situation and is to be commensurate with the risk of injury."

***McClung v. Delta Square Ltd. P'ship***, 937 S.W.2d 891, 895 (Tenn. 1996) (citations omitted). Whether the defendants breached the duty is a question of fact. ***Winkler v. Pinnacle Properties I, LLC***, M2011-02616-COA-R3-CV, 2012 WL 2989135, *4 (Tenn. Ct. App. July 20, 2012). In a non-jury case such as this one, we review the record *de novo* with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless the evidence preponderates to the contrary. Tenn. R. App. P. 13(d); ***Union Carbide v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993).

Appellants argue that nothing in the record supports the trial court's implicit finding

that the Ambulance Service breached the duty to exercise reasonable care. To support this argument, Appellants cite to Tennessee Code Annotated Section 55-8-108, which exempts emergency responders from some traffic laws. Tennessee Code Annotated Section 55-8-108 provides, in pertinent part:

> (a) The driver of an authorized emergency vehicle, when responding to an emergency call, or when in the pursuit of an actual or suspected violator of the law, or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section, but subject to the conditions stated in this section.
> (b)(1) A driver of an authorized emergency vehicle operating the vehicle in accordance with subsection (a) may:
>
> (A) Park or stand, notwithstanding other provisions of this chapter that regulate parking or standing;
> (B) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;
> (C) Exceed the speed limits so long as life or property is not thereby endangered; and
> (D) Disregard regulations governing direction of movement or turning in specified directions.[1]

Ms. McIntyre argues, however, that Tennessee Code Annotated Section 55-8-108 does not operate to excuse ambulance drivers from operating with due care, citing subsection (b)(2), which states that:

> Subdivision (b)(1) shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall subdivision (b)(1) protect the driver from the consequences of the driver's own reckless disregard for the safety of others.

Tenn. Code Ann. § 55-8-108(b)(2). Accordingly, Tennessee law provides that ambulance drivers are not required to strictly adhere to all traffic laws when responding to an emergency call, but must exercise these special privileges with "due regard for the safety of

---

[1] Although the statute concerns the duty of the driver of the ambulance rather than the ambulance service, neither Hardeman County nor the Ambulance Service has appealed the ruling that they may be liable for Mr. Love's negligence, regardless of Ms. McIntyre's failure to make him a proper party to this suit.

all persons." Tenn. Code Ann. § 55-8-108(b)(1)–(2).

There is no dispute in this case that Mr. Love and Ms. Fortune were responding to an emergency when the accident occurred. As such, they were entitled to exceed speed limits and disregard regulations governing the direction of movement. However, as explained by the statute, this exemption is tempered by the fact that the ambulance driver may not place life or property in danger and must exercise due regard for all drivers. The obligation to exercise due care is, thus, not excused by the fact that the ambulance driver is responding to an emergency call. As explained in American Jurisprudence:

> [T]he fact that an emergency vehicle on an emergency call is exempt from traffic regulations and is given the right of way over other travelers does not relieve the driver of such vehicle from the duty to drive with due regard for the safety of others using the highway. The drivers of emergency vehicles do not have the right to enter an intersection in blind reliance on their special right of way, but such drivers have to be alert and on the lookout for other travelers who might attempt to cross the intersection and who are lulled into a sense of security by the thought that they have the right of way.

8 Am. Jur. 2d Automobiles § 812 (footnotes omitted). As further explained:

> The fact that an ambulance is exempt from the operation of certain traffic regulations or enjoys certain prior rights over other vehicles does not permit the operators of such vehicles to drive in reckless disregard of the safety of others, nor does it relieve them of the general duty of exercising due care for the safety of others and their own safety.
> Generally speaking, an ambulance driver is under a duty to exercise due care for the safety of all persons, and an ambulance driver must exercise reasonable precautions against extraordinary dangers of the situation which duty compels the driver to create. The fact that ambulances are exempted from the operation of certain traffic regulations or enjoy certain prior rights over other vehicles does not permit the operators of such vehicles to drive in reckless disregard of the safety of others, nor does it relieve them from the general duty of exercising due care for the safety of others and their own safety, or from the consequences of an arbitrary exercise of the right of way. Any

careless, arbitrary, or unreasonable exercise of the driver's privileges is negligence. Under some statutes, the threshold for recovery for violation of the duty to exercise due care for the safety of all persons is recklessness, not negligence.

60A C.J.S. Motor Vehicles § 880 (footnotes omitted).

From our review of the record and the arguments of counsel in this case, it appears that Ms. McIntyre's theory of liability is that the ambulance driver breached his duty of care in driving down Tate Road at an excessive rate of speed. Indeed, the trial court's oral findings support our conclusion, as the trial court remarked that the photographs of the impact the ambulance had on Ms. McIntyre's car show that the ambulance was traveling "at a pretty good rate of speed." The trial court made no other findings as to any fault on the part of the ambulance driver or the Ambulance Service. Instead, the trial court even remarked that the ambulance's driver's maneuver into the opposite lane of traffic was "appropriate."

Accordingly, this Court must consider whether the evidence in the record preponderates against the trial court's finding that the Ambulance Service, through the actions of the ambulance driver, breached the duty of care by traveling at an excessive rate of speed. For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. **Watson v. Watson**, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005). We first turn to consider the evidence in the record that supports the trial court's finding that the ambulance driver breached the duty of care by traveling at an excessive rate of speed.

First, the trial court heard testimony from Ms. Anderson, who witnessed the events leading up to the collision. Ms. Anderson testified that at the time she observed the ambulance, it was traveling "fast" and "quick." Ms. Anderson admitted, however that she did not observe the ambulance immediately prior to the collision and was, therefore, unable to testify to the ambulance's speed at the time of the accident. Because Ms. McIntyre did not see the ambulance at any time prior to the accident, she was also unable to testify as to the speed of the ambulance at the time of the accident. Her testimony, therefore, is not probative of whether the ambulance was traveling at an excessive rate of speed.

The trial court also heard testimony from Ms. McIntyre and Ms. Ashworth regarding hearsay statements made after the collision suggesting that the ambulance was traveling approximately eighty miles per hour at the time of the crash. The trial court, however, did not credit this testimony and specifically found that the ambulance was not going eighty miles per hour. Ms. McIntyre does not challenge this ruling on appeal. Accordingly, we will likewise disregard the alleged hearsay statements suggesting that the ambulance was

traveling at a speed of eighty miles per hour.

Next, Ms. McIntyre submitted into evidence photographs depicting the impact damage to Ms. McIntyre's car. According to Ms. McIntyre, these photographs allowed the trial court to make a reasonable inference that the ambulance was traveling at an excessive rate of speed under the circumstances. It appears that the trial court credited this argument when it found that the "impact" to Ms. McIntyre's car showed that the car was traveling at a "pretty good rate of speed." Ms. McIntyre argues that the trial court's finding was proper because the trial court was able to infer the ambulance's speed from the photographs and testimony. Ms. McIntyre relies on this Court's opinion in *Ward v. Gilless*, No. W1999-01324-COA-R3-CV, 2000 WL 34411148 (Tenn. Ct. App. Aug. 21, 2000).

*Ward* involved an automobile accident that resulted in the death of driver ("the decedent"). *Id.* at *1. In *Ward*, the decedent's father ("plaintiff") filed a complaint for damages against the Shelby County Sheriff's Office and the Shelby County Division of Public Works (together, "defendants"), alleging that the defendants were negligent in failing to close the road on which the accident occurred due to flooding. *Id.* at *3. At the conclusion of the trial, the trial court found that the negligence of the decedent was greater than the negligence of the defendants and dismissed the case. *Id.* On appeal, the plaintiff argued that the evidence was insufficient to show any negligence on the part of the decedent. The Court of Appeals disagreed and affirmed the trial court. Explaining the rules of negligence with regard to the speed of an automobile, the Court stated:

> Under Tennessee law, the standard that must be applied in negligence cases is that of a reasonable and prudent person in the same or similar circumstances. *See Menuskin v. Williams*, 940 F.Supp. 1199, 1211 (E.D. Tenn.1996); *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 895 (Tenn. 1996); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995); *Dooley v. Everett*, 805 S.W.2d 380, 384 (Tenn. Ct. App. 1990); *Kelley v. Johnson*, 796 S .W.2d 155, 158 (Tenn. Ct. App. 1990). When determining whether an individual has conformed to this standard, the trier of fact must consider the evidence presented regarding the facts of the case and may also rely on the considerations of logic, common sense, public policy, and precedent. *See Kelley*, 796 S.W.2d at 158. When an individual is operating a motor vehicle, he or she is required to operate the vehicle in such a manner and at such a speed that is consistent with what a reasonable and prudent person would do under the same or similar circumstances. *See Cawthon v. Mayo*, 325

S.W.2d 629, 637 (Tenn. Ct. App. 1958); *Coleman v. Byrnes*, 242 S.W.2d 85, 89 (Tenn. Ct. App. 1950). Consistent with this general rule, a motorist must proceed at a speed sufficiently slow to enable him or her to stop in time to avoid any obstruction or condition in the roadway that he or she had a reason to expect. *See Cline v. United States*, 214 F.Supp. 66, 72 (E.D. Tenn. 1962). An acceptable speed of travel is one that is commensurate with the then existing conditions of the roadway and atmosphere. *See Hopper v. United States*, 122 F.Supp. 181, 188 (E.D. Tenn. 1953). The mere fact that a motorist is operating his or her vehicle at a speed that is within the limit proscribed by law does not preclude the conclusion that the speed is excessive under the circumstances. *See Cline*, 214 F.Supp. at 73; Hopper, 122 F.Supp. at 188. When determining whether an individual was operating his or her vehicle at an excessive speed under the circumstances, it is not essential that the trier of fact have before it direct evidence regarding this matter; rather, a finding with respect to *the speed of a vehicle may be inferred from the facts of the case*. *See Nash v. Love*, 440 S .W.2d 593, 598 (Tenn. Ct. App. 1968); *Templeton v. Quarles*, 374 S.W.2d 654, 658 (Tenn. Ct. App. 1963).

*Ward*, 2000 WL 34411148, at *3 (emphasis added).

Applying the above rules to the facts of the case, the Court of Appeals concluded that the trial court did not err in finding the decedent at fault for his own injuries when the evidence was undisputed that it had been raining heavily, the decedent was familiar with the road, and the road had posted signs warning high water was present. In addition, the sole witness to the accident testified that the decedent was driving at approximately thirty-seven miles per hour in a forty-five mile per hour zone, despite the heavy rain and warnings, which the trial court concluded was excessive given the circumstances.

Based on the rule expressed in *Ward*, Ms. McIntyre argues that the trial court could infer excessive speed on the part of the ambulance based upon the photographs showing the impact to her Town Car. In contrast, Appellants argue that the photographs alone are insufficient to support a finding of excessive speed.[2] Authority exists that evidence of

---

[2] We note that Ms. McIntyre objects to this argument on appeal due to the fact that the Appellants did not object to the admissibility of the photographs in the trial court. It is well-settled that issues are

(continued...)

-11-

violence and force of impact is a circumstance which may be considered by the fact finder in considering the question of whether a vehicle was traveling at an excessive or negligent rate of speed. 9 Blashfield's Cyclopedia of Automobile Law and Practice, § 6234; *see also* 29 A.L.R.3d 248 (noting that non-expert witness testimony is not admissible to estimate the speed of a vehicle, as the fact finder "is as qualified to estimate the speed of a motor vehicle from the physical facts as is the lay or nonexpert witness."). This principle has likewise been applied in Tennessee:

> Direct testimony is not essential to warrant a finding of excessive speed. Evidence as to the force of the impact of the collision, or as to the distance which an automobile causing an injury overshot the point of the accident before being brought to a standstill, is of significance, and may be by itself, or in connection with other circumstances, of sufficient force to warrant a jury in finding negligence as to speed, and in drawing an inference that the machine was traveling at a rate of speed such as to endanger the life or limb of persons upon the highway.

*Templeton v. Quarles*, 374 S.W.2d 654, 658 (Tenn. Ct. App. 1964) (citing *Elmore v. Thompson*, 14 Tenn. App. 78, 1931 WL 1579 (Tenn. Ct. App. 1932); *Phillips-Buttorf Mfg. Co. v. McAlexander*, 15 Tenn. App. 618, 1932 WL 1358 (Tenn. Ct. App. 1932)). All inferences must be based on the evidence and "cannot be based on surmise, speculation, conjecture, or guess[.]" *Benton v. Snyder*, 825 S.W.2d 409 (Tenn. 1992) (quoting *Patton v. L.O. Brayton & Co.*, 201 S.W.2d 981, 984 (Tenn. 1947)). We note, however, that the cases in which speed had been inferred by a non-expert from the circumstances surrounding the collision all involve evidence other than or in addition to photographs depicting the damage to the vehicles as a result of the collision. In fact, in most cases, the evidence relied on by the trial court concerned the skid marks on the road at the collision site. *See Johnson v. Attkinson*, 722 S.W.2d 390, 392 (Tenn. Ct. App. 1986) (involving skid marks); *Combs v. Rogers*, 450 S.W.2d 605, 608 (Tenn. Ct. App. 1969) (concluding that the evidence was insufficient to support a finding of excessive speed when the record contained no evidence

---

(...continued)

considered waived on appeal by the failure to present them at trial. *See ABN AMRO Mortg. Group, Inc. v. Southern Sec. Federal Credit Union*, No. W2011-00693-COA-R3CV, 2011 WL 5590320, at *4 (Tenn. Ct. App. Nov. 17, 2011) (citing *Waters v. Farr*, 291 S.W.3d 873, 918 (Tenn. 2009)). As we perceive Appellants' argument, however, they are not questioning the admissibility of the evidence, but rather find error in the trial court's reliance on the evidence to infer excessive speed. Thus, their argument is not waived and Ms. McIntyre's objection is without merit.

of skid marks); ***Monday v. Milsaps***, 264 S.W.2d 6, 17 (Tenn. Ct. App. 1953) ("The law is well settled that an expert witness may give his opinion as to the speed of an automobile from the length of its skidmarks.") (citing 32 C.J.S., Evidence, § 533). For example, the Court in ***Templeton*** considered evidence of skid marks and the distance the pedestrian plaintiff was thrown by the collision as probative evidence of "impact," rather than photographic evidence of the vehicle's damages. ***Templeton***, 374 S.W.2d at 658. In another case relying on ***Templeton***, ***Nash v. Love***, 440 S.W.2d 593 (Tenn. Ct. App. 1968), this Court held that the proof was likewise insufficient to allow the fact-finder to infer excessive speed when the record contained no evidence of skid marks on the road due to the collision, the distance the vehicle "overshot the point of impact," or how far the plaintiff pedestrian was thrown by the impact. ***Id.*** at 598. Thus, the term "impact," as it is used in ***Templeton*** and its progeny, refers to something more than mere photographs of the damage to a vehicle caused by a collision. *See also* ***Ward***, 2000 WL 34411148, at *3 (relying on ***Templeton***). The requirement that evidence other than mere photographs of vehicle damage be considered in determining speed is not novel: "Accurate computation of speed from damage to vehicles alone is not possible; it is difficult to measure the force required to distort a particular automobile part." 18 Am. Jur. Trials 443.

In this case, however, there is no evidence in the record regarding skid marks on the road from the accident. Further, there is nothing in the record to indicate the weight of either vehicle, the tire air pressure, or type and condition of the road surface at the time of the accident. All these factors have been held "necessary to estimate the speed of the vehicle." ***Johnson***, 722 S.W.2d 392. Thus, while the record does contain photographs depicting a substantial impact to Ms. McIntyre's car, the record is devoid of other evidence necessary to allow the finder of fact to infer excessive speed from the circumstances.

Finally, the record contains testimony from Ms. Fortune that the ambulance was traveling at no greater than fifteen miles per hour over the speed limit. Taking Ms. Fortune's belief that the speed limit on Tate Road was thirty-five miles per hour as true, as it is uncontroverted in the record, Ms. Fortune's testimony suggests that the speed the ambulance was traveling at approximately fifty miles per hour. Nothing in the record suggests that the trial court found Ms. Fortune's credibility lacking. Thus, the evidence in the record supports a finding that the ambulance was traveling up to fifteen miles above the posted speed limit.

A finding that the ambulance was traveling above the posted speed limit does not, *ipso facto*, lead to the conclusion that the ambulance driver breached his duty to drive with due care to all persons. Indeed, the Tennessee Supreme Court has held that "[u]nusual circumstances may make it reasonable to adopt a course of conduct which causes a high risk of harm to the public." ***Haynes v. Hamilton County***, 883 S.W.2d 606, (Tenn. 1994). "However, such conduct is not justified unless the end itself is of sufficient social value. The

general public has a significant interest in not being subjected to unreasonable risks of injury as the police carry out their duties." *Id.* (footnote omitted). The question, then, is whether traveling at a rate of speed fifteen miles per hour above the posted speed limit was reasonable given the circumstances. Thus, we turn to consider the circumstances surrounding the collision and whether those circumstances justify the ambulance driver's action in exceeding the posted speed limit.

First, it is undisputed that the ambulance was responding to an emergency drug overdose call at the time of the collision. In addition, both Ms. Anderson and Ms. Fortune testified that the ambulance had engaged both its emergency lights and siren throughout the events at issue in this case. Ms. McIntyre, however, testified that she believed that the ambulance driver at some point "turned [the siren] off." While the trial court did not make a specific finding that the ambulance driver had engaged his emergency lights and siren, the trial court did find Ms. McIntyre at fault for failing to search for the ambulance after hearing its siren. Accordingly, the trial court, at least inferentially, found that the ambulance had engaged its siren prior to the accident. Where the trial court does not make specific findings of fact, there is no presumption of correctness and we "must conduct our own independent review of the record to determine where the preponderance of the evidence lies." *Brooks v. Brooks*, 992 S.W.2d 403, 405 (Tenn. 1999). Based on the testimony of both Ms. Anderson and Ms. Fortune, we conclude that the weight of the evidence supports a finding that the ambulance driver engaged the ambulance's lights and sirens throughout the events at issue. Because the ambulance driver was responding to an emergency and had engaged the ambulance's emergency signals, the ambulance driver was entitled to exceed posted speed limits, so long as life or property was not endangered and he did so with due caution given the circumstances. *See* Tenn. Code Ann. §55-8-108. Additionally, the only direct evidence of speed suggests that the ambulance was traveling less than fifteen miles per hour over the posted speed limit, which is within the Ambulance Service's internal policy for speed in an emergency situation. Finally, uncontradicted evidence from Ms. Fortune also shows that the ambulance decelerated when approaching the turn off to Jones Road, proceeded around Ms. McIntyre's car "with caution," and only accelerated in an attempt to avoid the collision. These facts tend to support a finding that the ambulance was not negligent in traveling at a speed of fifteen miles per hour over the posted speed limit.

The road conditions on the day of the accident also tend to show that the ambulance's speed was not excessive given the circumstances. *See Haynes v. Hamilton County*, 883 S.W.2d 606, 611 (Tenn. 1994) (noting that in a case involving a police chase, the "weather and road conditions" are factors relevant to the determination of whether the emergency vehicle was operated in a negligent manner). First, the collision occurred in broad daylight on a clear day. No witness or party testified that there were adverse road conditions the day of the accident, such as rain or snow. In addition, Ms. Anderson testified that even though

at least one car was behind her on Tate Road, she could clearly hear and see the ambulance approaching. Indeed, Ms. Anderson saw the ambulance when it was far enough away that she was safely able to turn onto Jones Road. Finally, the turn off to Jones Road occurs at a part of Tate Road that is a straight path and is not concealed from other drivers by curves.

The situation in this case is analogous to the situation presented in ***Kowalski v. Eldridge***, 765 S.W.2d 746 (Tenn. Ct. App. 1988). In ***Kowalksi***, a fire truck was traveling down a road when the driver ahead of the fire truck swerved to the right, then immediately turned left into the fire truck, resulting in a collision in which the car driver died. ***Id.*** at 747. The driver's wife brought a wrongful death action against the operators of the fire truck. It was undisputed that the fire truck had engaged all its emergency signals, that the car driver did not engage his turn signal indicating his intent to turn left, and that the fire truck was traveling approximately ten-to-twenty miles per hour faster than the car. The trial court found that the fire truck driver was negligent "in approaching from the rear the [other] vehicle and attempting to pass on the left without first ascertaining in his own mind that he could do so with reasonable safety." The trial court further concluded that the car driver's negligence was excused by the sudden emergency doctrine, based on expert testimony that the car driver most likely perceived the approach of the fire truck as an emergency. ***Id.*** at 748.

The Court of Appeals, however, reversed, concluding that the sudden emergency doctrine did not apply because the driver, in suddenly turning left, created the emergency at issue. ***Id.*** at 747–48. In addition, the Court of Appeals concluded that the fire truck driver acted reasonably under the circumstances in passing to the left of the car, *see* Tenn. Code Ann. § 55-8-117 (detailing the procedure for passing on the left), despite the evidence that the fire truck was traveling at a much greater rate of speed than the car driver. ***Kowalski***, 765 S.W.2d at 749.

Similarly, in this case, the ambulance driver was traveling at a greater rate of speed than the posted speed limit when he attempted to overtake Ms. McIntyre's car on the left side. Ms. McIntyre, like the driver in ***Kowalski***, turned left onto Jones Road causing the collision with the ambulance. As previously discussed, we have concluded that the weight of the evidence shows that the ambulance driver had engaged his emergency lights and siren throughout the events at issue. Unlike in ***Kowalski***, however, the facts are disputed as to whether Ms. McIntyre had engaged her turn signal indicating her intent to turn left. The trial court also did not make a specific finding of fact as to whether Ms. McIntyre engaged her turn signal. Regardless of whether the turn signal was engaged, the evidence shows that the ambulance approached the turn off to Jones Road, decelerated and then proceeded around Ms. McIntyre's car "with caution." In addition, it is undisputed that Ms. Anderson was able to see and hear the ambulance prior to it reaching the turn off to Jones Road. Finally, Ms.

McIntyre perceived the siren of an ambulance prior to the collision, but, as found by the trial court, did not properly investigate the source of the sound, and consequently, did not yield to the ambulance as it passed on the left side of her vehicle. Tennessee Code Annotated 55-8-132 outlines the responsibility of a driver when an emergency vehicle approaches, stating that the driver must "yield the right-of-way . . . and shall stop and remain in that position until the authorized emergency vehicle has passed." Thus, Ms. McIntyre was under a statutory duty to yield to the ambulance as it approached. "[I]t is a general rule of law that, in the absence of circumstances indicating otherwise, the operator of a motor vehicle has the right to assume, and to act on the assumption, that other users of the highway will obey the law and exercise due care." *Hampton v. Padgett*, 414 S.W.2d 12, 15 (Tenn. App. Ct. 1967). The ambulance driver in this case, thus, "had the right to assume that [Ms. McIntyre] would lawfully respond not only to the emergency signals on the fire truck, but also to yield to a vehicle passing on the left." *Kowalski*, 765 S.W.2d at 749.

In addition, the circumstances of this case fail to rise to the level of other cases in which an ambulance driver or service has been found to be negligent for traveling at an excessive rate of speed. *See e.g., Shearn v Orlando Funeral Home, Inc.*, 82 So.2d 866 (Fla. 1955) (affirming finding of negligence when ambulance driver was traveling up to ninety miles per hour despite ordinance that only allowed emergency vehicles to travel thirty-five miles per hour); *Carter v. Acadian Ambulance Service, Inc.*, 342 So.2d 1145 (La. Ct. App. 1977) (finding of negligence affirmed when the evidence showed that the driver pulled into right lane of traffic without warning, accelerated at high rate of speed, did not activate emergency lights or siren until just before collision and took no action to avoid striking other vehicle); *Grammier-Dismukes Co. v Payton*, 22 S.W.2d 544 (Tex. Civ. App. 1929) (affirming a judgment for the plaintiff when the driver was traveling twenty to twenty-five miles over the speed limit on a foggy day without any audible signal to warn other drivers of its approach). Under the particular circumstances at issue in this case, we conclude that the greater convincing weight of the evidence in the record is that the ambulance driver acted reasonably in traveling down Tate Road at a speed of approximately fifty miles per hour and decelerating when approaching the turn off. *See Watson*, 196 S.W.3d at 701. Accordingly, the evidence preponderates against the trial court's finding that the ambulance was traveling at an excessive rate of speed under the circumstances.

Nothing in the trial court's oral ruling or written order suggests that the trial court attributed any other fault to the ambulance driver other than the use of excessive speed. From our review of the record, we likewise conclude that no other fault is attributable to the ambulance driver or Ambulance Service. Accordingly, the evidence likewise preponderates against the trial court's finding that the ambulance driver breached his duty of care in this case. As previously discussed, a breach of the duty of care is an essential element to any negligence claim. *Giggers*, 277 S.W.3d at 364. Without a breach on the part of the

Appellants or their employees, there can be no liability. Accordingly, we reverse the judgment against Appellants.

Based on its lack of liability, Hardeman County requests that this Court award its total requested damages. The parties stipulated that Hardeman County incurred $24,255.16 in damages for medical expenses and property damage. From our review of the trial court's order, the trial court found that Ms. McIntyre breached her duty of care in failing to look for the ambulance after she heard the siren and consequently failing to yield to the ambulance at the turn off to Jones Road. In addition, the trial court implicitly concluded that Ms. McIntyre's negligence was a cause in fact and a proximate cause of the accident, attributing forty percent of the fault for the collision to her. Ms. McIntyre does not appeal the trial court's finding that she breached the duty of care or that she was partially at fault for the accident. Having concluded that Appellants did not breach the duty of care and thus are not negligent, as well as that Ms. McIntyre did not appeal the trial court's finding that she was negligent, we award Hardeman County its stipulated damages of $24,255.16.

The judgment of the Hardeman County Circuit Court is reversed and the case is remanded for entry of judgment in favor of Appellant Hardeman County in the amount of $24,255.16. Costs of this appeal are taxed to Appellee, Judy McIntyre, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE