# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 1, 2022

## PAMELA DIANE STARK v. JOE EDWARD STARK

**Appeal from the Circuit Court for Shelby County**
**No. CT-002958-18   Robert Samual Weiss, Judge**



FILED

MAY 3 1 2022

Clerk of the Appellate Courts
Rec'd By

**No. W2020-01692-COA-R3-CV**

This appeal arises from a complaint for divorce filed in 2018. The multi-faceted litigation of this matter included three interspousal tort claims tried together with the divorce action, the adjudication of a motion for an order of protection and a petition for a restraining order, two contempt proceedings, two motions to recuse, interlocutory appeals to this Court, the denial of permission to appeal by the Tennessee Supreme Court, and the denial of certiorari by the United States Supreme Court. Proceedings in the trial court also precipitated two federal court actions. Following a six-day trial in 2020 and a stay of proceedings pending the Supreme Court's order on Wife's application for a writ of certiorari, the trial court entered final judgment in the matter in November 2021. Wife appeals the trial court's classification, valuation, and division of property. Wife also appeals the trial court's denial of her second motion to recuse. Discerning no evidence of bias, we affirm the trial court's denial of Wife's second motion to recuse. The trial court's classification, valuation, and division of property is reversed in part, and affirmed in part as modified.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part as modified; Reversed in part; and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Pamela Diane Stark, Blue Eye, Missouri, appellant, pro se.

Melissa C. Berry and Michelle S. Crawford, Memphis, Tennessee, for the appellee, Joe Edward Stark.

# MEMORANDUM OPINION[1]

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

The protracted litigation of this divorce action included the adjudication of three tort claims asserted by Wife; Husband's petition for an order of protection; Husband's petition for a restraining order; two motions for recusal filed by Wife; a petition for civil or criminal contempt filed by Husband; and two orders of contempt against Wife. Additionally, during the pendency of this lawsuit in the trial court, Wife filed federal declaratory and civil rights actions seeking relief from a restraining order imposed against her by the trial court in 2019. See *Stark v. Weiss*, No: 2:19-cv-02406-JTF-tmp, 2019 WL 6348455 (W.D. Tenn. Nov. 27, 2019) (granting Defendant's motion to dismiss). She also filed a federal action against Husband, counsel for Husband, the Memphis and Shelby County District Attorney's Office, the Memphis Police Department, and the Mayor of Memphis. Wife's complaint asserted a number of claims of official misconduct, conspiracy to violate her First Amendment Rights under the United States Constitution, and violation of First Amendment, equal protection, and due process rights under the United States Constitution. *See Stark v. City of Memphis*, No. 2:19-cv-2396-JTF-tmp, 2021 WL 597880 (W.D. Tenn. Feb. 16, 2021) (Defendants' motions to dismiss granted in part and denied in part).[2] Notwithstanding the multi-faceted litigation of this matter, the background facts relevant to our disposition of the issues raised on appeal are largely undisputed.

## A. Background Facts

Appellant Pamela Diane Stark ("Wife") and Appellee Joe Edward Stark ("Husband") met through work when Wife was an assistant district attorney in the Shelby County District Attorney General's Office and Husband was a sergeant in the Homicide Division of the Memphis City Police Department ("MPD"). The parties became romantically involved in 2010, and in 2011 Husband moved into Wife's home on Brittany Lane in Atoka, Tennessee ("the Brittany Lane property"). Husband and his previous wife were divorced in April 2013, and the parties married in May 2013. It was Husband's second marriage and Wife's third. Wife was approximately 48 years old when the parties married; Husband was 54. Wife and Husband both have children from previous marriages,

---

[1] Rule 10 of the Rules of the Court of Appeals provides:

> This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

[2] Appellant/Wife and Appellee/Husband both reference the federal actions in their briefs, citing the Record "generally."

but no children were born of this marriage.

In June 2014, the parties purchased a home on McLean Avenue in Memphis ("the Memphis residence") that was divided into two apartments and included a guest house. Although the Memphis residence was titled jointly, the mortgage was in Wife's name only. The residence, particularly the guest house, needed substantial repair and renovation.

The Brittany Lane property was listed for sale in March 2015. However, Wife withdrew it from the market in April 2015, when Husband left the marriage, leased an apartment, and expended significant sums to furnish the apartment. Husband asserts the parties were residing in the Brittany Lane property when they separated; Wife asserts that they had relocated to the Memphis residence and that she moved back to the Brittany Lane property after Husband left the Memphis residence. The upstairs apartment in the Memphis residence was rented at a rate of $300 per month, and Wife paid the mortgages on both properties from her employment income and the rental income. Wife completed renovations on the guest house at the Memphis residence, and in November 2015 the guest house was rented at a rate of $500 per month.

In April 2016, the Brittany Lane property was rented to Wife's daughter for $1,000 per month, which amount Wife testified equaled approximately 70 percent of the mortgage payment. Wife filed her first complaint for divorce in April 2016. Wife asserts she moved into the downstairs apartment in the Memphis residence before filing the complaint. After a separation of approximately one year, the parties reconciled in May 2016, and Wife nonsuited her complaint for divorce. Husband asserts that he returned to the Brittany Lane property when he returned to the marriage; Wife asserts that he returned to the Memphis residence.

The parties resided together in the Memphis residence for approximately 11 months until they separated again in March 2017. Husband again moved out of the Memphis residence, leased an apartment, and again expended sums to furnish the apartment. Wife filed a second complaint for divorce shortly thereafter. The parties reconciled after a separation of nine or ten months, however, and Wife nonsuited her second complaint for divorce. The parties resided together in the Memphis residence until June 2018, when they separated for the third and final time following a physical altercation between them on June 17.

In the meantime, while the parties were separated in 2015, Husband enrolled in the Deferred Retirement Option Plan ("DROP") offered by the City of Memphis ("City") under its pension ordinance. The DROP program permits a City employee, who paid into the City's pension plan for at least 25 years, to defer retirement for one, two or three years. At the end of the deferment period, retirement is mandatory. During the deferment period, the City deposits the pension payments that the employee would have received had he/she not deferred retirement into an interest-bearing DROP account. Under the City's pension

- 3 -

ordinance, a married enrollee's spouse automatically is named as beneficiary of the account. Husband enrolled in the DROP in July 2015. The City subsequently offered participants an opportunity to temporarily suspend or "freeze" participation for up to two years, and Husband suspended participation in November 2015. The City did not deposit funds into the DROP account while it was frozen, and Husband paid into the City's pension plan during the freeze period. Husband resumed participation in the program in November 2017, and his mandatory retirement date under the DROP was set for July 15, 2020. From July through November 2015, and from November 2017 to July 2020, the City deposited funds that Husband would have received as pension payments into the DROP account. Husband received his full salary and did not pay into the City's pension plan while participating in the DROP program.

The parties agree that the only significant assets owned by Husband and/or Wife – as either separate or marital property – are the Brittany Lane property, the Memphis residence, their respective pensions, Husband's DROP account, Husband's leave/bonus compensation, a 2011 Jeep Compass, and a 2017 Jeep Renegade.

## B. Procedural History

This case has a lengthy procedural history. Following review of the entire record transmitted to this Court, we confine our discussion of the procedural history to those portions that are relevant to our disposition of the issues raised on appeal. We observe, that much of the litigation in this case arises from Husband's January 2019 petition for a restraining order and the trial court's March 2019 orders granting Husband's petition and finding Wife in contempt. Because that history is integrally related to one of the issues raised by Wife on appeal, we recite that portion of the procedural history in detail.

The physical altercation between the parties in June 2018 precipitated Wife's third complaint for divorce.[3] In her June 29, 2018, complaint, Wife alleged irreconcilable differences and inappropriate marital conduct as grounds for divorce. Notice of the mandatory temporary injunctions prescribed by Tennessee Code Annotated section 36-4-106 was issued to the parties on the same day.

Husband filed an amended answer in August 2018 and denied allegations of inappropriate marital conduct. He alleged Wife was guilty of inappropriate marital conduct and counter-complained for divorce. In December 2018, the trial court granted Wife's motion to amend her complaint to include an "interspousal tort action." In her amended complaint, Wife added claims for battery and intentional infliction of emotional distress

---

[3] It appears from the record that Wife filed her first complaint for divorce in April 2016 and nonsuited it in November 2016. It appears that Wife filed her second complaint for divorce in May 2017 and nonsuited it in December 2017.

and prayed for damages. She also alleged that she had supported Husband and had assisted Husband to pay off his debt, and that Husband had promised to pay off Wife's student loans upon receiving funds from his DROP account. She asserted claims for fraudulent inducement and/or promissory estoppel and/or unjust enrichment and sought damages in the amount of her student loan balance. Husband answered in January 2019 and asserted that Wife had failed to state a claim with respect to her tort claims. Husband denied Wife's allegations of inappropriate marital conduct and the allegations asserted in Wife's tort claims.

In January 2019, Wife filed notices to take several depositions, including depositions of four of Husband's colleagues from the MPD. She caused subpoenas to be issued for depositions to be taken at the Memphis residence, where Wife continued to reside. She also sought to depose Husband at the Memphis residence. In response, on January 9, Husband filed a motion for a protective order and asserted that requiring Husband and his colleagues to appear for depositions at the parties' former marital residence would cause him "embarrassment or annoyance, oppression, and an undue burden." Husband sought a protective order requiring Wife to take the depositions at the courthouse or another public building. Husband also sought an order requiring his deposition to be taken audio-visually or in the presence of a bailiff in light of Wife's allegations of domestic violence. He also prayed for attorney's fees. Wife filed her response in opposition to Husband's petition on January 14.

On January 15, 2019, Husband filed a petition for a restraining order. In his petition, Husband asserted that Wife had posted a Facebook post accusing him of domestic violence and disparaging the MPD's handling and investigation of the June 2018 altercation. He attached a copy of the post to his petition. Husband asserted that the post would cause him immediate and irreparable harm, including possible loss of his position with the MPD. He also prayed for attorney's fees incurred in bringing the petition. In her response, Wife asserted that the MPD had been aware of her allegations of domestic violence since July 1, 2018, when she gave an audio-recorded statement to an officer with the Domestic Violence Unit.[4] She further asserted that her post on social media was political commentary made in response to an unrelated December 2018 fatal shooting and was protected speech under the United States and Tennessee Constitutions.

Over Wife's objections, the trial court heard Husband's motion for a protective order on January 25, 2019. By order entered February 13, 2019, the trial court granted Husband's motion for a protective order and ordered any depositions of Husband and his colleagues to be taken at the Shelby County Courthouse. The trial court found Husband's

---

[4] The record contains a transcription of the statement given by Wife to the MPD on July 1, 2018, in response to the complaint of domestic violence made by Husband against Wife following the June 2018 altercation. In her statement, Wife asserted that she was the victim and Husband was the aggressor. The record also contains a letter dated June 25, 2018, from Husband to his superior at the MPD concerning the June 17 incident and Wife's activity on Facebook.

request that his deposition be taken audio-visually or in the presence of a bailiff to be reasonable under the circumstances. The trial court reserved Husband's request for attorney's fees.

The trial court heard Husband's petition for a restraining order on February 7, 2019. At the hearing, Husband asserted that the mandatory injunction provided by Tennessee Code Annotated Section 36-4-106 should extend to social media websites.[5] Wife did not deny posting the Facebook post. She also did not deny that she had written a letter to the Mayor of Memphis alleging that the MPD had mishandled its investigation of the June 2018 altercation.[6] She asserted that the December 2018 Facebook post did not disparage Husband, that it disparaged Husband's employer, and that it was political commentary. Wife asserted:

> I have an absolute right to make allegations that I have been a victim of corruption from the Police Department. And for you to rule otherwise is far outside this divorce proceeding. Everything that has been brought before this [c]ourt including the letter to the mayor is my attempt to get somebody to look at what the Memphis Police Department has done. And I have an absolute right to do that, Judge. An absolute right.

From the bench, the trial court ordered Wife to remove the Facebook post that day. Wife refused, stating,

> Well, Your Honor, I will just with all candor to the [c]ourt say you might as well take me into custody right now. I have contacted the FBI as well as having contacted the mayor of Memphis to try and get this addressed. I am

---

[5] Section 36-4-106(d)(1) provides, in pertinent part:

> Upon the filing of a petition for divorce or legal separation, and upon personal service of the complaint and summons on the respondent or upon waiver and acceptance of service by the respondent, the following temporary injunctions shall be in effect against both parties until the final decree of divorce or order of legal separation is entered, the petition is dismissed, the parties reach agreement, or until the court modifies or dissolves the injunction, written notice of which shall be served with the complaint:

> . . .

> (C) An injunction restraining both parties from harassing, threatening, assaulting or abusing the other and from making disparaging remarks about the other to or in the presence of any children of the parties or to either party's employer[.]

[6] The record contains a letter dated January 17, 2019, from Wife to Memphis Mayor Jim Strickland. In her letter, Wife asserted that she was "a victim, first of domestic violence, then of the misconduct of the Memphis Police Department."

- 6 -

saying that I am a victim of corruption from the Memphis Police Department, and I am going to pursue every course of action I have and . . .

The trial court interrupted and asked Wife whether she intended to remove the post. Wife responded, "I am not." The trial court ordered Wife to be taken into custody and held the court in recess. When the hearing resumed, the trial court again asked Wife whether she intended to comply with the court's order, and Wife again declared that she would not. The trial court found Wife to be in direct contempt of court and ordered that she be held in custody until she agreed to remove the Facebook post and apologize to the court. The court again ordered a recess. After being held in custody for approximately four hours, Wife agreed to remove the Facebook post and was released from custody.

The trial court granted Husband's petition for restraining order on February 13, 2019. The trial court found that Wife had contacted Husband's supervisors, including Memphis Mayor Jim Strickland, in contravention of the mandatory injunction issued pursuant to Section 36-4-106 and "that the sole purpose of making this (Facebook) post and contacting [Husband's] employer was to harass [Husband]" in contravention of the injunction. The trial court further found that Wife "put on no defense proof only arguing that she had a right to post the statements." The trial court ordered Wife to remove the December 2018 Facebook post and enjoined her from making any public allegations against Husband on any social media platform or to his employer. On March 8, Husband filed a motion to amend the court's order on his petition for restraining order. The trial court heard Husband's motion to amend and several discovery and scheduling motions on March 29, 2019. On April 9, the trial court entered an order denying Husband's motion to amend the restraining order and ordering discovery to be completed prior to trial. The trial court scheduled the matter to be heard on September 12, 2019.

The trial court entered its order on direct civil contempt on March 29, 2019. On April 14, 2019, Wife filed a notice of appeal of the trial court's orders on contempt and Husband's petition for restraining order in this Court. In January 2020, we dismissed Wife's appeal of the trial court's order granting Husband's petition for a restraining order upon finding Wife's appeal had not been properly perfected. *Stark v. Stark*, No. W2019-00650-COA-R3-CV, 2020 WL 507644, at *3 (Tenn. Ct. App. Jan. 31, 2020), *perm. app. denied* (Tenn. Aug. 10, 2020), *cert. denied*, 141 S. Ct. 1687 (2021). We dismissed Wife's appeal of the trial court's order finding her in contempt as moot and upon determining that Wife had not shown "specific collateral consequences resulting from the trial court's finding of contempt." *Id*. at *7.

In the meantime, Wife filed a motion to recuse following entry of the trial court's order on contempt on March 29, 2019. In her motion, Wife alleged that the trial court's order on contempt, combined with its decisions granting Husband's motion for protective order and Husband's petition for restraining order, demonstrated bias that warranted

- 7 -

recusal. On April 17, Wife filed a supplemental motion to recuse under Tennessee Supreme Court Rule 10B. The trial court denied Wife's motions to recuse by order entered May 3, 2019, and Wife filed a notice of appeal in this Court on May 22. On June 18, 2019, a different panel of this Court affirmed the trial court's denial of Wife's motion to recuse. *Stark v. Stark*, No. W2019-00901-COA-T10B-CV, 2019 WL 2515925, at *11 (Tenn. Ct. App. June 18, 2019).

In July 2019, Husband filed a petition for civil and criminal contempt and for determination of the reserved issue of attorney's fees. In his petition, Husband asserted that Wife had posted images on social media suggesting that she had been silenced and that Wife continued to reference her allegations of domestic violence in the context of his employment. Husband asserted that an article entitled "Former prosecutor: Memphis police 'destroyed my career' after domestic assault involving officer" was published in the Memphis *Commercial Appeal* in June 2019, and that the article "feature[d] photographs and statements obtained through interviews with Wife[.]" Husband attached copies of the Facebook post and the *Commercial Appeal* article to his petition. The trial court issued a Fiat and Notice of Hearing setting Husband's petition to be heard on August 16, 2019. On August 13, Wife filed a motion for a stay and/or continuance. At the August 16 hearing on Husband's contempt petition, the trial court noted that Wife had filed an action in the United States District Court for the Western District of Tennessee ("federal court") and continued the matter. The court also continued the trial scheduled for September 12, 2019.

On August 28, Wife filed a motion in this Court to stay proceedings pertaining to the restraining order. On September 7, 2019, we denied Wife's motion for failure to comply with Rule 7 of the Tennessee Rules of Appellate Procedure. The trial court held a status conference on October 16 and set the matter to be tried on December 5, 2019.

On October 17, 2019, Husband moved for a hearing date on his July 2019 petition for civil and criminal contempt and for determination of the reserved issue of attorney's fees. Following a hearing on November 1, the trial court continued the matter upon determining that Wife "was not in agreement with the Court hearing the pending Petition for Civil and Criminal Contempt and for Determination of Reserved Attorney Fees at the Divorce trial setting in light of the pending appeal and the pending Federal Court case against the Court." The trial court further found that Husband's petition for contempt and the underlying divorce action were "inherently linked" and that "it would be illogical to hear the [d]ivorce trial prior to the pending [p]etition and further it would not be a good use of judicial resources to not try the matters together."

In its November 1, 2019, order, the trial court accordingly continued the

- 8 -

matter and set a status conference for January 15, 2020. The status conference was held on January 15, and the matter was set to be tried on April 30, 2020. Wife did not appear at the status conference on January 15 but appeared on January 16. On January 23, Wife filed a motion to compel Husband to release a transcript of the January 15 proceedings and asserted that the court's calendar on the clerk's website had reflected a hearing date of January 16. On February 11, Husband filed a motion for scheduling order. Following a hearing on February 21, the trial court entered a scheduling order and scheduled the matter to be heard on April 30, 2020. On February 24, the trial court entered an order granting Wife's motion to compel, noting that the court's November 1, 2019 order set the hearing for January 15 and that "the clerk inadvertently posted the matter for hearing on the 15th and 16th of January on the online calendar." In the meantime, on February 19, 2020, Wife filed a motion to dismiss Husband's petition for civil and criminal contempt or, in the alternative, for a bill of particulars/more definitive statement. On March 13, Husband filed a motion for arguments to be heard.

On March 20, 2020, Wife filed a motion to alter or amend the restraining order and contempt order. In her motion, Wife asserted, "[a]s a content-based, speaker-based, and overbroad restriction on speech, Tennessee Code Annotated § 36-4-106(d)(3) is unconstitutional and contravenes the First Amendment, and the temporary restraining order that the Court issued based on that statute should be dissolved as void."[7] She further asserted that, as applied to Wife, the section is an unconstitutional restraint in contravention of the First Amendment of the United States Constitution and Article I, Sections 19 and 23 of the Tennessee Constitution. Wife also asserted that the trial court's order directing her to remove the December 2018 Facebook post and enjoining her from making further allegations against Husband on any social media platform "are unconstitutional, content-based, speaker-based, prior restraints that contravene the First Amendment and Article I, Section 19 and 23 of the Tennessee Constitution."

On March 20, 2020, Wife also filed a response to Husband's motion for arguments on Wife's motion to dismiss the petition for civil and criminal contempt. In her response, Wife noted that the trial court had set an April 3, 2020 deadline for all motions to be filed on all non-dispositive matters. Wife argued that her petition to dismiss Husband's contempt petition and her motion to alter or amend the restraining order should be heard at the same time because resolution of her motion to alter or amend could render her motion to dismiss moot. Wife additionally asserted that counsel for Husband had approached the

---

[7] Tennessee Code Annotated Section 36-4-106(d)(3) provides:

> The temporary injunctions provided in this section shall only apply to the spousal parties named in the petition and shall not apply to any third party named in the petition; provided, however, that nothing in this subsection (d) shall preclude any party from applying to the court for an order of injunctive or extraordinary relief against any other party named in any petition as provided by law or rule.

court *ex parte* and had "directly commented to this Court concerning information pending adjudication[.]" She noted that the Tennessee Supreme Court had ordered that no in-person hearings be held until after March 31, 2020, in response to COVID-19, and asserted, "Wife is unwilling to agree to have any proceeding in this matter go forward without the absolute ability to observe first hand all that transpires. While the current situation necessitated by COVID-19 is unfortunate, surely even defense counsel does not suggest that this was orchestrated by Wife."

A status conference was held on March 30, 2020. By order entered April 20, 2020, the trial court set Wife's motion to dismiss Husband's petition for civil and criminal contempt or, in the alternative, motion for bill of particulars/more definite statements, Husband's motion for arguments on Wife's motion and for attorney's fees, and Wife's motion to alter or amend the restraining order and contempt order to be heard on May 14, 2020. Wife's claim for divorce, Husband's counter-claim for divorce, and Wife's tort claims were set to be tried on June 10, 2020.

On May 5, 2020, Wife filed a memorandum of law in support of her petition to alter or amend the 2019 restraining order and order on contempt. The State of Tennessee filed a motion to intervene to defend the constitutionality of the statute, and the trial court granted the State's motion on May 29, 2020. In its partial response to Wife's motion to alter or amend the restraining order, the State argued that Wife had waived any challenge to the constitutionality of section 36-4-106(d)(3) by failing to raise it earlier; that the divorce was set to be heard on June 10 and the matter would become moot following entry of the final decree of divorce; and that the trial court "likely lack[ed] jurisdiction" because the matter was pending on appeal.

On May 6, 2020, Wife filed a motion to modify the scheduling order with respect to discovery and to continue the hearing on the divorce petitions to July 2020. On May 12, Husband filed his response to Wife's motion to alter or amend the restraining order and contempt order and his response to Wife's motion to modify the scheduling order.

The trial court heard Wife's motion to dismiss Husband's petition for civil and criminal contempt or, in the alternative, motion for bill of particulars/more definitive statement; Husband's motion for arguments; and Wife's response to Husband's motion for arguments via Zoom on May 14, 2020. By order entered on May 18, the trial court denied Wife's motion to dismiss; denied her motion for more definite statement with respect to the allegations of criminal contempt; and granted Wife's motion for more definite statement with respect to Husband's allegations of civil contempt. The trial court ordered Husband to identify which Facebook posts allegedly formed the basis of civil contempt. The court again reserved the issue of attorney's fees. Husband filed his definite statement pertaining to civil contempt on May 21. Husband identified a February 7, 2019 Facebook post, which he submitted was an edited version of Wife's December 2018 post; a May 9, 2019 post, which was subsequently deleted; and a May 16, 2019 post, which also was

deleted.

On June 5, 2020, the trial court heard Wife's March 20 motion to alter or amend the restraining order and the contempt order, the State's partial response, and Husband's motion in opposition. On June 8, the trial court stayed the proceedings for lack of jurisdiction because Wife's application for permission to appeal this Court's January 2020 judgment was pending in the Tennessee Supreme Court. The trial court likewise stayed Husband's July 2019 petition for civil and criminal contempt. In its order, the trial court noted that Wife had raised the question of a potential conflict with respect to intervention by the Tennessee Attorney General in the matter because the Attorney General's office had defended the court in the earlier litigation in federal court. The trial court specifically found that intervening counsel for the State was based in the Nashville office and had no interaction with counsel based in the Memphis office, who had participated in the litigation in federal court. The court again reserved the issue of attorney's fees. On June 8, in a separate order, the trial court also denied Wife's May 6 motion to modify the discovery scheduling order.

Wife's complaint for divorce, Husband's counter-complaint for divorce, and Wife's tort claims were heard over six days in June and July 2020. The trial court entered the final decree of divorce on November 24, 2020. The trial court found that both parties had contributed to the demise of the marriage and were entitled to a divorce pursuant to Tennessee Code Annotated section 36-4-129. The trial court dismissed Wife's claim for the intentional infliction of emotional distress for failure to establish the elements necessary to support the claim. The trial court found that that although "there was clearly unwanted touching by [Husband]" during the course of the June 2018 altercation, "both parties were in contact with the other," and Wife had not carried her burden of proof to support her claim of battery or proven any damages related to "the contact." The court also dismissed Wife's claims of fraudulent inducement or promissory fraud upon determining that, although the parties might have discussed using Husband's retirement funds to pay off Wife's student debt, any such discussion was in the course of "plans, dreams and hopes for the future." The court also found that there was no written documentation to memorialize an agreement and dismissed Wife's claim. The trial court classified and divided the parties' property, and it awarded Husband attorney's fees in the amount of $38,709. The trial court denied Wife's request for alimony. Husband's petition for civil and criminal contempt and Wife's motion to alter or amend the restraining order and order of contempt were reserved. Wife filed a notice of appeal to this Court on December 22, 2020.

In the meantime, in August 2020, the Tennessee Supreme Court denied Wife's application to appeal this Court's January 2020 judgement on the trial court's 2019 restraining order and order on contempt. On November 6, 2020, Husband filed a motion to set a hearing date on his petition for civil and criminal contempt. On November 18, Wife filed a second motion to recuse in the trial court. The trial court denied Wife's second motion to recuse on December 14, 2020. On December 18, the trial court heard Wife's

- 11 -

motion to alter or amend the restraining order and contempt order, Husband's response, and the State's partial response to Wife's motion. On January 18, 2021, Wife filed a motion to stay the trial court's bench rulings pending the United States Supreme Court's review of her application for a writ of certiorari. In her motion to stay, Wife asserted that, in her November 18, 2020 second motion to recuse, she had requested, in the alternative, a stay of proceedings pending appellate review and that the court had not ruled on her request.

By order entered January 21, 2021, the trial court denied Wife's motion to alter or amend the 2019 restraining order and order on contempt. The trial court determined that Husband's petition for civil and criminal contempt was not moot and had been specifically reserved in the final decree of divorce; that the temporary injunction provided by Tennessee Code Annotated section 36-4-106(d) was constitutionally valid and enforceable by the court when attached to the summons and properly served; and that the injunctive relief granted by the court ordering Wife to remove the December 2018 Facebook post was narrowly tailored injunctive relief properly granted under Rule 65.07 of the Tennessee Rules of Civil Procedure.

The Supreme Court denied Wife's application for certiorari in March 2021,[8] and the trial court heard Husband's petition for civil and criminal contempt on August 10, 2021. By order entered September 30, 2021, the trial court found Wife guilty of criminal contempt of the court's on-going mandatory injunction for 1) knowingly and intentionally participating in the creation of the June 2019 *Commercial Appeal* article; and 2) willfully posting on Facebook, in May 2019, a slightly modified version of the post she was ordered to remove on February 7, 2019. The court ordered Wife to perform 160 hours of community service with the Family Safe Center (or a comparable agency representing victims of abuse) to be completed by December 31, 2022. The court also ordered Wife to pay Husband's attorney's fees and expenses related to the petition in the amount of $3,500. On November 15, 2021, the trial court stayed execution on the judgment pending appeal.[9] On November 15, the trial court also granted Wife's motion for additional findings and confirmed a judgment in the amount of $48,464.64 in favor of Husband, plus post-judgment interest to begin after the expiry of a 180-day period. The trial court specifically denied any remaining claims or requests for relief.

On March 11, 2022, Husband/Appellee submitted a motion for consideration of post-judgment facts in this Court. We denied the motion on March 15, 2022. Briefing was completed by the parties on March 29, 2022, and this appeal was docketed to be submitted on the briefs on April 1, 2022.

---

[8] *Stark v. Stark*, 141 S. Ct. 1687 (2021).

[9] The trial court's September 2021 order on contempt has been separately appealed and is not before us here.

## II. Issues Presented

Wife raises the following issues for review, as stated in her brief:

I. Whether the Trial Court's division of the marital estate is inequitable.
a. Whether the Trial Court improperly classified the assets and debts subject to marital division
b. Whether the Trial Court improperly valued various assets
c. Whether the Trial Court improperly divided the marital estate

II. The Trial Court's comments as well as evidentiary, procedural and ethical errors constitute a bias against Ms. Stark and create an appearance of impropriety that taints the Court's ruling on each issue and prevented Ms. Stark from receiving a fair adjudication of her tort actions.

## III. Standard of Review

This case was tried without a jury. Accordingly, under Rule 13(d) of the Tennessee Rules of Appellate Procedure, our review of the trial court's findings of fact is *de novo* upon the record with a presumption of correctness unless the evidence preponderates otherwise. *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 512 (Tenn. 2012). The evidence preponderates against the trial court's findings of fact when it supports another finding "with greater convincing effect." *Hardeman Cnty. v. McIntyre*, 420 S.W.3d 742, 749 (Tenn. Ct. App. 2013) (citation omitted). The trial court's findings of fact must, therefore, contain sufficient underlying facts to clearly disclose the basis of the trial court's determinations. *Lovelace v. Coley*, 418 S.W.3d 1, 34 (Tenn. 2013) (citations omitted). We review the trial court's conclusions of law *de novo* with no presumption of correctness. *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012).

## IV. Analysis

### A. Classification, Valuation, and Division of Property

We turn first to the trial court's classification and valuation of the parties' property and the division of marital property. In her brief to this Court, Wife asserts that the trial court erred in its classification of the Brittany Lane property as marital property under the doctrine of transmutation, that it erred by classifying Husband's attorney's fees as marital debt, and that it erred by excluding the parties' pensions when it divided the marital property. She also contends that the trial court erred in determining the value of assets and that the trial court transposed the award of the parties' vehicles, which impacted the overall

division of property.

Under our divorce statutes, the trial court must classify the parties' property as either marital or separate before dividing marital property. *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988) (citation omitted). The classification of property is essential because only marital property may be divided between the parties. *Id.* "Thus, as a first order of business, it is incumbent on the trial court to classify the property, to give each party their separate property, and then to divide the marital property equitably." *Id.* (citation omitted). The classification of property is a question of fact that must be determined in light of the relevant circumstances. *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 245 (Tenn. 2009) (citations omitted).

The Tennessee Code defines separate property as:

(A) All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986 (26 U.S.C.), as amended;
(B) Property acquired in exchange for property acquired before the marriage;
(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);
(D) Property acquired by a spouse at any time by gift, bequest, devise or descent;
(E) Pain and suffering awards, victim of crime compensation awards, future medical expenses, and future lost wages; and
(F) Property acquired by a spouse after an order of legal separation where the court has made a final disposition of property.

Tenn. Code Ann. § 36-4-121(b)(2) (footnote omitted). We turn first to the trial court's classification of the Brittany Lane property as marital property under the doctrine of transmutation.

### 1. Classification of the Brittany Lane Property

"[A]ssets acquired by either spouse prior to the marriage are presumed to be separate property." *Owens v. Owens*, 241 S.W.3d 478, 485 (Tenn. Ct. App. 2007). However, the trial court in this case determined that the Brittany Lane property owned by Wife prior to the parties' marriage had become marital property under the doctrine of transmutation. Under that doctrine, separate property may become marital property if the parties treat it in a way that evidences an intent to make it part of the marital estate. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002) (quotation omitted); *Eldridge v. Eldridge*, 137 S.W.3d 1, 13 (Tenn. Ct. App. 2002). Whether transmutation has

- 14 -

occurred is a question of fact. *Id.* The factors most often considered to determine whether transmutation of real property has occurred are:

> (1) the use of the property as a marital residence; (2) the ongoing maintenance and management of the property by both parties; (3) placing the title to the property in joint ownership; and (4) using the credit of the non-owner spouse to improve the property.

*Luplow v. Luplow*, 450 S.W.3d 105, 114 (Tenn. Ct. App. 2014) (quoting *Fox v. Fox*, No. M2004-01616-COA-R3-CV, 2006 WL 2535407, at *5 (Tenn. Ct. App. Sept. 1, 2006)). The party asserting that transmutation has occurred carries the burden of proof at trial to demonstrate "an intent of the parties that the separate property be treated as marital property." *Nesbitt v. Nesbitt*, M2006-02645-COA-R3-CV, 2009 WL 112538, at *9 (Tenn. Ct. App. Jan. 14, 2009) (citing *Keyt v. Keyt*, 244 S.W.3d 321, 328 n. 7 (Tenn. 2007)).

In this case, it is undisputed that Husband moved into Wife's Brittany Lane property in 2011, while he was still married to his first wife, and the trial court made few findings to support its determination that the property had become marital property. In its November 2020 order, the trial court found:

> Wife purchased the Brittany Lane Property in 2005, and the parties lived in the property pre-marriage and continued to live there after the marriage until they moved into the house on McLean [in Memphis] in early 2016. The Court finds the Brittany Lane Property was held out as the martial home and both parties contributed to its maintenance and upkeep. The Court finds that the Brittany Lane Property was transmuted from separate property to marital property.

The trial court made no additional, underlying findings to support its conclusion that the Brittany Lane property was transmuted into marital property. The trial court determined that the Brittany Lane property was encumbered by a mortgage in the amount of $66,876 and that the fair market value of the property was $215,000. The trial court awarded 76 percent of the equity in the property to Wife and 24 percent to Husband.

As noted above, the parties separated and reconciled twice before Wife, acting *pro se*,[10] filed a third complaint for divorce on June 29, 2018. Although the parties were married for seven years when the trial court entered the final decree of divorce in this matter in November 2020, they were married for only five years when Wife filed her third complaint for divorce. During those five years, the parties separated twice—the first time for approximately one year and the second time for nearly ten months. The parties have

---

[10] In compliance with Local Rule 21, in October 2018 Wife provided notice to the court that she is a licensed attorney practicing in Shelby County.

not cohabitated since Wife filed her June 2018 complaint for divorce, and it is undisputed that they lived together for only 40 months of their seven-year marriage.

Upon review of the record, we observe that title to the Brittany Lane property was not placed in joint ownership and that the parties resided in the property for fewer than two years of the marriage. Wife maintains that the parties relocated from the Britany Lane property to the Memphis residence in early 2015 before they separated in April 2015. She asserts that Husband moved out of the Memphis residence when he left the marriage the first time; that the upstairs apartment was rented to a friend; and that she moved back to the Brittany Lane property while undertaking repairs and renovations on the Memphis residence. Wife further maintains that she completed the necessary repairs to the guest house while the parties were separated and that she eventually rented the guest house to a friend in November 2015. She asserts that she relocated to the downstairs apartment in the Memphis residence and rented the Brittany Lane property to her daughter in April 2016. Wife also asserts that when Husband returned to the marriage in May 2016, he returned to the Memphis residence.

At the June 2020 divorce hearing, Husband initially testified that the parties were living in the Brittany Lane property when they separated in April 2015. He subsequently testified that he did not recall when the parties moved to Memphis or whether they were living in Memphis or at the Brittany Lane property when they separated in 2015. Husband also testified that he told Wife, "at one time, that you know, I really didn't feel comfortable living at the house because that's where her and her husband were at, you know." Husband stated that he had less of "an issue with it" when he "got to know [Wife's previous] husband," but did not testify as to whether he communicated his decreasing discomfort to Wife.

With respect to the maintenance and management of the Brittany Lane property, Husband testified that he removed the popcorn ceilings from the property prior to the marriage, and that he performed general maintenance including unclogging the sink and toilet and mowing the grass before the parties separated in April 2015. Husband testified that he painted the Brittany Lane property, but did not testify with respect to whether the painting was completed during the course of the marriage. Wife acknowledges in her brief to this Court that Husband contributed somewhat to the on-going general maintenance of the property, and Husband testified that he replaced a deck board "every once in a while" and that "there was other things in the house that I may have done, but not a whole lot of maintenance. It was ... it was in pretty good shape." He testified that the parties entertained at the Brittany Lane property, although their family guests consisted of Wife's family. Husband testified that, although Wife had access to his bank accounts during the periods that the parties were not separated, "she generally used her account" to pay the bills. He stated, "occasionally, she would get money out of my account, but that was— that wasn't very often." He did not testify as to whether Wife used funds from Husband's accounts to pay for expenses associated with the maintenance of or improvements to the

- 16 -

property as opposed to general household expenses. Husband testified that the countertops were replaced while the parties were separated and that he "was not involved with that." He similarly testified that Wife "put carpet—or put flooring in" prior to renting the property to her daughter and that he "wasn't involved in it." Husband also acknowledged removing Wife from his accounts during the parties' separations and that he did not reinstate her to the accounts after the second separation in 2017. We note the following exchange:

Q.    Now, Mr. Stark, you freely admit that during the 41-some months that you and Ms. Stark have been separated during this 81-month marriage, you didn't contribute to any of the bills or mortgage payments or anything associated with either one of the properties, correct?
A.    Yes.
Q.    And you left Ms. Stark to make those payments on her own?
A.    Yes.

We further observe Husband's responses to questions posed by his counsel at the February 7, 2019, hearing in the trial court:

Q.    Do you (and Wife) have any assets together?
A.    We have a house together in Midtown and a Jeep Cherokee.
Q.    That's it?
A.    Yes.

There is no dispute that the Brittany Lane property was titled in Wife's name, that she owned it for seven years prior to the parties' marriage, and that Husband's credit was not used to improve the property. The parties resided in the property for less than two years of their seven-year marriage, and Husband's testimony indicates that he assumed no responsibility for the property after the parties married other than to perform basic maintenance. Additionally, Husband acknowledges that he entered the marriage with substantial debt and financial obligations to his first wife, and that Wife paid for the expenses at the Brittany Lane property.

Notwithstanding statements made in pleadings and in his brief to this Court, Husband's testimony belies any joint "management" or substantial decision-making responsibilities with respect to the Brittany Lane property. Husband's testimony clearly demonstrates that he did not consider the Brittany Lane property to be marital property when the parties separated in 2018, and it is well-settled that statements made in pleadings, statement of counsel, and briefs to this Court do not constitute evidence. *Metro. Gov't. of Nashville and Davidson Cnty. v. Shacklett*, 554 S.W.2d 601, 605 (Tenn. 1977); *Greer v. City of Memphis*, 356 S.W.3d 917, 923 (Tenn. Ct. App. 2010). The status of property in a divorce action, depends "on the conduct of the parties." *Arms v. Stanton*, 43 S.W.3d 510, 513 (Tenn. Ct. App. 2000) (quoting *Hand v. Hand*, C/A No. 01A01-9607-CH-00325, 1997 WL 187310, at *3 (Tenn. Ct. App. April 18, 1997)) (internal quotation marks

omitted). Upon review of the record, we find that Husband failed to carry his burden of proof to demonstrate that the Brittany Lane property became marital property under the doctrine of transmutation. Contrary to the trial court's determination, the Brittany Lane property is Wife's separate property and is not subject to division.

## 2. Valuation of Assets

We turn next to Wife's assertion that the trial court erred in its valuation of the parties' marital property. The trial court must consider all relevant evidence when determining the value of a marital asset. *Powell v. Powell*, 124 S.W.3d 100, 105 (Tenn. Ct. App. 2003) (quotation omitted). The parties carry the burden to produce evidence of value. *Id.* When the evidence conflicts, the trial court "may assign a value that is within range of values supported by the evidence." *Id.* at 105-106.

### The Motor Vehicles

As an initial matter, Wife submits that the spreadsheet attached to the trial court's order transposed the award of vehicles to the parties, thereby affecting the value of the property award to each party. We agree. Wife is properly awarded the Jeep Renegade, which has an equity value of $4,697; the Jeep Compass, valued at $8,000, is awarded to Husband.

### Wife's Savings and Checking Accounts

Wife also submits that the trial court erred by over-valuing her savings and checking accounts. She contends that the trial court relied on Husband's marital balance sheet, which reflected balances from March 2020. She argues that the balances changed significantly between March and the June 2020 hearing because she expended significant amounts between the date of valuation and the date of trial.

As a practical matter, the trial court must assign, or the parties must agree to, some valuation date. *See Telfer v. Telfer*, 558 S.W.3d 643, 656 (Tenn. Ct. App. 2018). Following a hearing on February 21, 2020, the trial court entered a scheduling order requiring most discovery to be completed by March 2020 and witness depositions to be concluded by April 10, 2020. The trial court valued Wife's accounts within the time set by the scheduling order based on values submitted at that time, and we accordingly discern no error.

### The Memphis Residence

The spreadsheet incorporated into the trial court's order assigns a fair market value of $165,000 and a debt of $111,188 to the Memphis residence. Wife submits that the debt assigned to the residence is a typographical error. She contends that, although the debt

recited on the spreadsheet "appears within a note on [the] updated spreadsheet" that Wife submitted to the court on the last day of trial, it was "clearly a clerical error." She submits that "the mortgage balance submitted by [Husband] at trial noting a mortgage balance as of February 2020 of $120,193.02" is consistent with her trial memorandum, which "listed the mortgage balance as $119,188.41." We observe that the marital balance sheet submitted by Husband recites a fair market value of $177,000 for the Memphis residence, while the trial court determined the fair market value to be $165,000. The trial court assigned an equity amount of $53,812 to the Memphis residence. Using Husband's values, the equity value would be approximately $57,000. We can assign no error to the trial court for using the values submitted by Wife on her updated spreadsheet.

### Husband's DROP Account and Leave/Bonus Payout

The trial court valued Husband's DROP account at $131,825.48 and his leave/bonus compensation payout at $45,737.45. When it valued the assets for purposes of dividing the marital estate, the trial court reduced those values by 22 percent in consideration of potential tax consequences to Husband. The trial court awarded 24 percent of the after-tax "marital equity" of both assets to Wife and 76 percent to Husband.

Wife contends that the trial court erred by reducing the gross value of Husband's DROP account and leave/bonus compensation when valuing those assets. Wife does not argue that the trial court erred by considering the tax consequences associated with the assets when dividing the marital estate. Rather, she submits that the potential tax consequences are relevant to the division of property, not to the value of the marital property. Wife also submits that there was no evidence to support a reduction in the amount of 22 percent. Husband, on the other hand, contends in his brief that the assets should be considered as an element of his pension and "divided pursuant to the marital fraction." However, he points to no evidence to support a tax reduction in the amount of 22 percent.

Tennessee Code Annotated section 36-4-121(c)(9) requires the trial court to consider "[t]he tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset" when equitably dividing the marital estate. This Court has stated that "the tax effects associated with a particular asset can become relevant when the court divides the marital estate, but not when it assigns values to the respective marital assets." *Clark v. Clark*, M2006-00934-COA-R3-CV, 2007 WL 1462226, at *4 (Tenn. Ct. App. May 18, 2007). Thus, the tax consequences should not be incorporated into the calculation of an asset's value. *Id.*

In this case, Husband's DROP account and accumulated leave/bonus payout are the only substantial liquid assets to be divided between the parties, and the trial court is statutorily required to consider the tax consequences of these assets when it divides the marital estate. Following the June 2020 trial of this case, the trial court made the following

- 19 -

oral ruling on July 2:

> The DROP money and vacation, sick, bonus time will all be taxable events, and the Court cannot guess what will actually be received. Accordingly, within five days of receipt, husband shall provide documentation of what was received, and the - whatever the—again, the numbers that I have just relayed are guidance for the—for now, but, ultimately, whatever the amount— whatever the amount is, is the amount and should be divided on, again, 76/24 percent basis.

> Husband shall provide documentation of what was received. In light of the fact that wife will be responsible for paying husband's share or—husband his share of the residences and the attorney fees, wife shall only receive $6,000 from that sum. The balance of the DROP and vacation owed to her will be credited against the attorney fees.

Construing the trial court's oral ruling, the final decree of divorce, and the division of property spreadsheet together, we cannot conclude that the trial court erred in valuing the accounts. It appears the trial court valued the assets at "fair market value," divided them on a "76/24 percent basis[,]" and effectively reduced the amount to be awarded to each party by 22 percent in consideration of the potential tax consequences to Husband. The fair market values assigned by the trial court are supported by the record, and we accordingly affirm those values.

We turn next to Wife's assertion that the record contains no evidence to support a 22 percent reduction for taxes. Husband testified that "from what [he] understood, [the DROP payout is] going to be $133,000 at the end[] ... [and t]hey take 20,000 out automatically for taxes." He also testified, "And I have been told keep 10,000 out more, because with the end of the year, you're going to need it. Because when you add the DROP and you add my buy-out and what I have made this year so far, it's going to put me in a whole new tax bracket, which is 32 percent taxes."

Following the trial court's oral ruling on July 2, on July 15 Husband's counsel emailed the trial judge regarding Husband's leave/bonus payout and DROP account. She indicated that the gross payout from Husband's leave/bonus payout would be $45,737.45 and the gross DROP payout would be $131,825.48. Counsel also supplied a calculation of the net payout assuming a tax rate of 32 percent. The record contains an MPD final pay calculation worksheet that recites a total leave/bonus payout in the amount of $45,737.45. The payout calculation does not include a calculation of the tax liability associated with the payout.

The trial court implicitly rejected the 32 percent rate asserted by Husband, applied a 22 percent tax rate, and reduced both parties' shares by 22 percent. In his brief to this

- 20 -

Court, Husband points to no proof to support the trial court's application of a 22 percent reduction for taxes. Husband states in his brief:

> Husband contends the trial court, using the facts of the case, equitably divided the money accrued during the marriage to both Wife and Husband using a sort of marital fraction taking into account the amount of time the parties lived separately juxtaposed with the total length of the marriage. However, Wife received a payout of the same nature in February 2019 during the midst of these divorce proceedings. Husband would submit that the Court should have offset Wife's award of Husband's accrued vacation, sick, and bonus time with the amounts Wife received but were not equitably divided with Husband.

Notwithstanding the assertions in Husband's brief, Husband raised no issues for our review. Accordingly, to the extent Husband is asserting error with respect to the trial court's determination, the issue is waived. *See Childress v. Union Realty Co.,* 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002) (citation omitted) (stating that an issue is waived if it is not raised in the statement of the issues, even if the issue is argued in the party's appellate brief). We additionally note that Husband submits in his brief that the trial court did not err in the valuation or division of assets.

The "party relying on tax consequences" bears "the burden of introducing competent proof on the subject[.]" *Clark v. Clark,* No. M2006-00934-COA-R3-CV, 2007 WL 146226, at *6 (Tenn. Ct. App. May 18, 2007) (citing *Cf. Kinard v. Kinard,* 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998)) (discussing burden of proof on the issue of valuation of a note of indebtedness on business). Other than speculating at trial about what he was "told" to expect, it appears that Husband introduced no proof of the tax consequences of his leave/bonus payout.

As in *Clark,* the tax consequences associated with Husband's leave/bonus payout in this case are "speculative and unsupported in the record." *See Clark,* 2007 WL 146226, at *5. In *Clark,* we held that the trial court's order "reflected this reality when it declined to factor . . . taxes into the property division because there was 'no competent proof thereof at trial.'" *Id.* In the current case, the trial court provided no basis for its application of a 22 percent reduction in the amount awarded to Wife from Husband's leave/bonus payout.

Upon review of the record, however, we observe that the DROP election form completed by Husband in June 2015 provides for a "mandatory twenty percent (20%) tax withholding[.]" The record also contains a letter from the City's pension coordinator stating that Husband was expected to retire on July 15, 2020, and that as of June, 19, 2020, Husband's estimated DROP account balance was $131,825.48. It further states, "[Husband] has the option to rollover or receive a lump sum (taxed 20%) of his total DROP amount." Thus, the record supports a conclusion that a 20 percent tax liability is associated

with the DROP account.

## Attorney's Fees

We turn next to Wife's assertion that the trial court erred by classifying Husband's attorney's fees as marital debt and dividing the fees equally between the parties in the division of marital property. We begin our discussion of this issue by noting that the final decree of divorce entered by the trial court in November 2020 orders Wife to pay half of Husband's attorney's fees and provides that the award of attorney's fees "owed by Wife to Husband shall be considered a domestic support obligation and shall be non-dischargeable in bankruptcy." However, the decree also provides that "the martial assets should be divided in accordance with the Stark Asset Spreadsheet attached hereto and incorporated as Exhibit A and in accordance with the remaining paragraphs set out herein." The spreadsheet incorporated into the trial court's order includes Husband's attorney's fees as marital debt and assigns one-half of those fees to each party.

Marital debt is subject to equitable division in a divorce action. *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). Under the statutes existing when this matter was tried, however, attorney fees incurred by the parties in a divorce action are not marital debt.[11] *Rountree v. Rountree*, 369 S.W.3d 122, 134 (Tenn. Ct. App. 2012) (citation omitted). Rather, attorney's fees in a divorce action may be awarded as alimony *in solido*. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 113 (Tenn. 2011). The *Gonsewski* court stated:

> As with any alimony award, in deciding whether to award attorney's fees as alimony *in solido*, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36-5-121(i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses or the spouse would be required to deplete his or her resources in order to pay them. Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony.

---

[11] We observe that Tennessee Code Annotated Section 36-4-121 was amended effective March 31, 2022, to provide, in relevant part, that marital debt "[i]ncludes debt incurred to pay attorney fees and expenses incurred in connection with the proceedings, and unpaid attorney fees and expenses incurred in connection with the proceedings through the date of the final hearing and any proceedings brought pursuant to Rule 59 of the Tennessee Rules of Civil Procedure[.] Tenn. Code Ann. § 36-4-121(b)(3)(West 2022); 2022 Tenn. Pub. Acts 762.

*Id.* (internal citations omitted). The determination of whether attorney's fees are warranted as an award of alimony *in solido* is within the sound discretion of the trial court. *Id.*

However, an award of alimony is not one of the statutory factors to be considered by the trial court when dividing the marital estate. *Murdock v. Murdock*, No. W2019-00979-COA-R3-CV, 2022 WL 611024, at *11 (Tenn. Ct. App. Mar. 2, 2022). We have noted:

> it is clear that the legislature did not intend the award of spousal support to be a consideration in the equitable division of the marital estate; however, it did intend the division of marital property to be considered in awarding alimony. Because the division of marital property is a consideration in the award of spousal support, the trial court was correct to first divide the marital estate before considering the award of alimony.

*Id.*

Husband asserts that the trial court's award of attorney's fees in this case "was actually an equalization of marital funds/assets that had been spent" by Husband. He cites *Aaron v. Aaron*, 909 S.W.2d 408 (Tenn. 1995), for the proposition that he is entitled to attorney's fees because Wife "paid nothing" while he incurred substantial fees and the trial court found those fees to be reasonable. Husband argues, in the alternative, that "Wife's litigation tactics caused him to incur unnecessary attorney fees, all of which were within the trial court's discretion to award in the nature of alimony."

*Aaron* is inapposite to this case. The husband in *Aaron* held an MBA, had 25 years of professional experience, and his gross average income was approximately $295,000 per year. The wife did not have a college degree and had never been employed outside the home. The trial court awarded wife a divorce on the grounds of inappropriate marital conduct, ordered husband to pay alimony *in futuro*, and "further ordered" husband to pay wife's attorney's fees. *Aaron v. Aaron*, 909 S.W.2d 408, 409 (Tenn. 1995). On appeal, this Court "relieved Mr. Aaron of the obligation to pay Ms. Aaron's attorney's fees; rather, it ordered the attorney's fees be paid from the proceeds of the sale of a marital asset (realty located in Polk County, Georgia) before the proceeds were equally divided between the parties." *Id.* The supreme court reinstated the trial court's award of attorney's fees to wife upon determining that husband had paid his attorney's fees from marital assets. The *Aaron* court found that wife effectively had paid half of husband's attorney's fees "even though she ha[d] no obligation to pay [those] fees." *Id.* at 411. The *Aaron* court opined, "by ordering her attorney's fees to be paid out of marital assets, the Court of Appeals has, in fact, required Ms. Aaron to pay one-half of her own fees in addition to one-half of Mr. Aaron' fees. This is not what the trial court had in mind[.]" *Id.*

In the current case, however, Wife used no martial assets to pay attorney's fees, and Husband accordingly did not effectively pay half of those fees. Husband's assertion that

- 23 -

he is entitled to one-half of his attorney's fees because Wife represented herself and "paid nothing" is not supported by *Aaron*. Husband's argument stands for the proposition that the parties' attorney's fees should be regarded as marital debt. The statues applicable to this case do not support that proposition.

The final decree of divorce provides:

Husband's obligation to pay twenty-four percent (24%) of his DROP and Retirement Payout to Wife shall be offset by Wife's obligation to pay Husband $38,708.96 in attorney's fees and his share of the equity in the real property. However, Wife shall receive $6,000.00 from Husband's Retirement Payout. After offsetting Husband's DROP and Retirement Payout obligation with Wife's share of Husband's attorney fee obligation and paying Husband for his share of the equity in the real property, any remaining amounts due and owing Husband shall be paid by Wife within one hundred and eighty days (180) of the entry of this Final Decree Any amounts which remain still due and owing to Husband, by Wife after one hundred and eighty days (180) shall be reduced to judgment in favor of Husband for which let execution issue if necessary, and shall be in the nature of a domestic support obligation which is non-dischargeable in bankruptcy.

Thus, the trial court characterized the award of attorney's fees to Husband as a "domestic support obligation," but it also divided the fees between the parties as "share[s]" in the context of the division of property. Additionally, as noted, the spreadsheet incorporated into the final decree includes Husband's attorney's fees in the calculation of the division of marital property.

Whether the trial court intended the award of attorney's fees to constitute an award of alimony *in solido* or a division of marital debt requires us to interpret the judgment. "The interpretation of a judgment is a question of law." *Pruitt v. Pruitt*, 293 S.W.3d 537, 544 (Tenn. Ct. App. 2008) (citation omitted). Our review of this judgment accordingly is *de novo* with no presumption of correctness. *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). It is well-settled that:

Judgments are to be construed like other written instruments, the determinative factor being the intention of the court as gathered from all parts of the judgment. Such construction should be given to a judgment as will give force and effect to every word of it, if possible, and make its several parts consistent, effective and reasonable.

*Blue Cross-Blue Shield of Tennessee v. Eddins*, 516 S.W.2d 76, 78 (Tenn. 1974) (quoting *Branch v. Branch*, 249 S.W.2d 581, 582-583 (Tenn. Ct. App. 1952)) (internal citations omitted).

The trial court's judgment in this case, read in conjunction with the spreadsheet incorporated into the judgment, indicates that the trial court treated Husband's attorney's fees as marital debt. Additionally, the trial court ruled orally on July 9, 2020, and stated, "[f]rom the [c]ourt's perspective, there are four major assets and one major debt that the [c]ourt needs to divide: the marital residence [in Memphis]; the [Brittany Lane] property; [H]usband's DROP money; his bonus time; and [H]usband's attorney's fees." Even if we were to construe the award of attorney's fees to Husband as an award of alimony *in solido* based on the court's characterization of the award as a "domestic support obligation" of some nature, we observe that the trial court made no findings with respect to whether an award of attorney's fees as alimony *in solido* is appropriate or necessary in this case.

Husband relies on ***Gilliam v. Gilliam***, 776 S.W.2d 81 (Tenn. Ct. App. 1988), for the proposition that he is entitled to attorney's fees as an award of alimony *in solido* because Wife "used the judicial process as a retaliatory weapon against Husband." The ***Gilliam*** court found that the defendant/husband in that case had testified that "retaliation is a 'mode of life.'" ***Gilliam***, 776 S.W.2d at 86. The ***Gilliam*** court further observed that husband had abused the discovery process, made false responses to interrogatories and in depositions, and had "consistently engaged in a course of legal stone-walling and obstructive tactics in an attempt to not only wear down Wife, but to deplete her assets as well." *Id*. at 87. The court in ***Gilliam*** found that plaintiff/wife had been "penalized" by "defendant's evasive tactics, false responses, attempts to hide assets, false allegations and complete unwillingness to cooperate." *Id*. at 87. The trial court in ***Gilliam*** also found that the defendant husband was "clearly at fault for the collapse of th[e] marriage, and that during the process of dissolution Wife was subjected to extreme cruel and inhuman treatment." *Id*. at 86. The ***Gilliam*** court affirmed a cash award of attorney's fees to wife as alimony *in solido* upon finding that requiring wife to use marital property to pay attorney's fees would "totally extinguish [her] liquid assets." *Id*. at 87. The court emphasized, "[t]his is not in any way to indicate that a litigant should not be free to fight his cause with zeal to the extent necessary to prevail. In this case it appears that Husband went beyond the bounds of reason." *Id*. at 86.

Notwithstanding the complexity of the litigation in this matter, the attorney's fees awarded in this case were confined to the proceedings in the trial court. We observe that the divorce proceedings were complicated by Husband's petition for a restraining order, Wife's alleged disregard of the restraining order, and Wife's tort claims, which were adjudicated within the divorce action. Husband does not direct us to any attempt on his part to bifurcate the tort action from the divorce proceedings, and that issue is not before us. Additionally, Husband continued to pursue his petition for civil and criminal contempt against Wife long after the final decree of divorce was entered in this matter.

Unlike the court in ***Guilliam***, here the trial court made no findings with respect to whether Wife intentionally used the judicial process to wear down Husband or to deplete

- 25 -

his assets. Further, the trial court found that both parties "contributed to fault in the divorce." Upon review of the record, we agree. As noted, the trial court in this case made no findings to support an award of alimony *in solido*. Rather the trial court divided Husband's attorney's fees as marital debt and assigned one-half to each party. Accordingly, we reverse the award of attorney's fees to Husband.

## 3. Division of Marital Property

"Trial courts have wide latitude in fashioning an equitable division of marital property[.]" *Ludlow v. Ludlow*, 450 S.W.3d 105, 110 (Tenn. Ct. App. 2014) (citing *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn. 1983)). Therefore, we give great weight to the trial court's determination regarding that division. *Id.* However, our determination that neither the Brittany Lane property nor Husband's attorney's fees are subject to division as part of the marital estate requires reconsideration of the division of marital property in this case. *See Flannary v. Flannary*, 121 S.W.3d 647, 651 (Tenn. 2003) (holding that the equitable division of marital property may be reconsidered in light of the reclassification of property by the appellate court). Although the division of marital property generally is within the purview of the trial court, in the interests of judicial economy and in view of the already protracted litigation in this case, we will resolve this issue based on the record and the proof adduced at trial.

It is well-settled that the division of marital property in a divorce action must be equitable. *See, e.g., Brown v Brown*, 577 S.W.3d 206, 212 (Tenn. Ct. App. 2018) (citations omitted). "An equitable division of marital property does not require a precisely equal division of marital assets, but requires a fair final result." *Hankins v. Hankins*, No. W2009-00240-COA-R3-CV, 2010 WL 1172204, at *4 (Tenn. Ct. App. Mar. 26, 2010) (citing *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002); *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988)). Accordingly, we have repeatedly noted that "'[a] trial court is charged not with making an equitable division of each separate marital asset but rather with making an equitable division of the entire marital estate.'" *Tarver v. Tarver*, No. W2017-01556-COA-R3-CV, 2019 WL 1200274, at *13 (Tenn. Ct. App. Mar. 13, 2019) (quoting *Givens v. Givens*, No. E2016-00865-COA-R3-CV, 2017 WL 4339489, at *8 (Tenn. Ct. App. Sept. 29, 2017)).

The Tennessee Code requires the trial court to consider all relevant factors when equitably dividing marital property, including:

(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

- 26 -

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable. Depending on the characteristics of the asset, such considerations could include, but would not be limited to, a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence;

(11) The amount of social security benefits available to each spouse; and

(12) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c).

The trial court found:

This was not a long marriage. The parties married on May 28, 2013, which under normal circumstances would have equated to a seven-year marriage, but this was not a normal marriage. The parties both acknowledge that this has been a turbulent marriage from almost the start, with Wife filing and pursuing two other Divorce Complaints prior to the current filing, which was filed in June, 2018. Because of the rocky relationship and the repeated filings the parties have been together less time [than] they were apart, having been together for only 40 of the last 84 months.

The parties do not dispute the trial court's characterization of their marriage as short and turbulent. Generally, "in a marriage of short duration, trial courts attempt to place the parties as nearly as possible in the financial positions they occupied before the marriage took place." *Broadbent v. Broadbent*, 211 S.W.3d 216, 222 (Tenn. 2006). However, "the division of marital property is not a mechanical process, *Larsen-Ball v. Ball*, 301 S.W.3d 228, 234 (Tenn. 2010) (citation omitted), and the duration of the marriage is but one factor to be considered by the trial court when dividing marital assets, particularly when one spouse has contributed substantially to the value of those assets. *See Powell v. Powell*, 124 S.W.3d 100, 108 (Tenn. Ct. App. 2003). "Rather, the trial court should weigh the most relevant factors in light of the facts of each case." *Larsen-Ball*, 301 S.W.3d at 234 (citation omitted). The relevant factors include "the actions of the parties" with respect to the parties' assets during the marriage. *Flannary v. Flannary*, 121 S.W.3d 647, 651 (Tenn. 2003).

Although they were legally married for seven years, as discussed above, the parties have not lived together since June 2018; they were separated twice for a total of nearly two years between April 2015 and June 2018; and their finances were separated for much of the marriage. Additionally, the parties were both employed prior to the marriage, during the course of the marriage, and throughout the course of the proceedings in the trial court—Wife as an attorney and Husband as a sergeant in the homicide division of the MPD. Both have separate property and access to pensions upon retirement. Our review of the record supports the trial court's characterization of this marriage as "turbulent."

The parties have three significant marital assets: the Memphis residence, Husband's leave/bonus compensation that accrued during the marriage, and the DROP account. They also have two vehicles, their separately held checking and savings accounts, and the marital portion of their pensions. Husband's separate property includes a time share in Branson, two smaller retirement accounts that he owned prior to the marriage, and the non-marital portion of his pension with the MPD. In addition to the non-marital portion of her pension, Wife's separate property includes a Camaro, and, in light of the foregoing, the Brittany Lane property.

As observed above, the trial found that Husband "did not contribute to the parties' marital assets during the periods of separation[,]" and it is undisputed that marital assets were used to pay debts that Husband incurred prior to the marriage. It is also undisputed that Wife incurred student loan debt prior to the marriage, that Husband incurred additional debt while the parties were separated in 2015-2016 and in 2017, and that marital assets were used to pay the expenses of both parties during the course of the marriage. The testimony indicates that the parties maintained individual bank accounts and credit cards, and their financial accounts remained largely separate during the periods of separation and after the 2017 separation. Husband did not contribute to the expenses associated with improvements made to the Memphis residence during the periods of separation, and in his brief Husband acknowledges that the renovations to the guest house were completed by

- 28 -

Wife and her brother. With the foregoing in mind, we turn to the division of the marital estate.

## The Pensions, Savings and Checking Accounts

Wife asserts that the trial court improperly excluded the value of the parties' pensions from consideration when it divided the martial estate. Her argument, as we understand it, is that a calculation of the value of the marital portion of the parties' pensions is necessary to determine the equitable division of martial property. Wife asserts that, should she elect to begin drawing her pension at age fifty-five, her monthly pension value would be $783 and the marital value would be $298 per month. She asserts that if she elects to receive pension benefits at age fifty-five, over the course of ten years, she will receive $35,760 from the marital portion of her pension, and Husband will receive $160,200 from the marital portion of his pension over the same ten-year period. Wife acknowledges, however, that if she delays retirement until age 65, her monthly pension benefit would be $2,156.41. At the June trial of this matter, Wife testified,

> I can either begin receiving benefits when I'm 65 in the amount of $2,156.41; or I can start receiving them next month when I'm 55, but I'll only receive $782.35. Obviously, for obvious reasons, I had always intended on deferring it to 65, but at this point, given I don't have any income in the foreseeable next few months, I may have to opt to change it to be 55.

Husband, on the other hand, asserts in his brief that the parties had more "pensionable years of service" before the marriage than after, that they were separated for a considerable portion of the marriage, and that Wife received a "payout of the same nature [as his leave compensation] in February 2019[.]" He also contends that the trial court should have offset the award to Wife of a portion of Husband's accumulated leave/bonus compensation with accrued leave and bonus time amounts paid out to Wife when she changed employment in 2019. Husband further contends that the martial fraction of Wife's pension would amount to $711.61 per month, that the martial fraction of his pension would amount to $578.99 per month, and that an equal division of those amounts would result in Wife owing Husband $66.31 per month. Additionally, although Husband does not dispute that the DROP fund was established during the marriage or that a portion of the funds deposited into it are marital, he contends that the DROP account should be included in the calculation of the fraction of his pension that is martial property.

As discussed above, to the extent that Husband contends that the trial court erred in its valuation or division of property, Husband's issue is waived. Husband raised no issues for our review and asserted that "the trial court properly classified, valued and divided the property of the parties[.]"

As Wife asserts, the trial court appears not to have classified the parties' pensions

- 29 -

as either marital or separate, but awarded each party his or her respective pension. Under the Tennessee Code, the value of a pension that accrues from employment during a marriage is marital property, Tenn. Code Ann. § 36-4-121(b)(1)(B)(i), and the parties agree that a portion of their respective pensions is marital property. Although the spreadsheet attached to the decree of divorce does not include the parties' pensions, the table contained in Wife's brief in accordance with Rule 7 of the Tennessee Rules of Appellate Procedure reflects that the trial court valued Husband's pension income at $3,735 per month and Wife's at $2,156 per month. The evidence supports the trial court's valuation of the expected monthly income that each pension will provide. Because the parties acknowledge that a portion of their respective pensions is marital property, we perceive the trial court's award as implicitly awarding each party the martial portion of their pension. In light of the totality of the record and the factors enumerated in the Tennessee Code, the trial court's decision to award each party the marital portion of their pension is not inequitable.

Similarly, the trial court's award to each party of their respective savings and checking accounts without classifying them as either separate or marital works no inequity in this case. The value of those accounts, the equity associated with the parties' vehicles, and the income each party may expect to receive from his or her respective pension, however, must be considered when construing an equitable division of the remainder of the parties' marital property.

### The Memphis Residence

The Memphis residence was the parties' marital residence when they separated in 2018 and is clearly marital property because it was acquired during the marriage and is jointly titled. However, the mortgage associated with the Memphis residence is in Wife's name only; Wife resided in the property from 2015 through the course of the divorce proceedings; and Husband resided in the property only intermittently for brief periods between lengthy separations. It appears that Wife completed most of the repairs and renovations on the property, and Husband did not contribute to the property while the parties were separated. The trial court determined that the marital equity in the Memphis residence was $53,812 and awarded 76 percent of the property ($40,897) to Wife and 24 percent ($12,915) to Husband. In light of the equities of this case, we reverse the trial court's division of the Memphis residence and award the property to Wife in total.

### Leave/Bonus Compensation

We turn next to the accrued leave/bonus compensation that will be paid to Husband upon retirement. The trial court determined that the fair market/gross value of the benefit was $45,737. After applying a 22 percent reduction for taxes, the trial court determined that the marital equity value of Husband's leave/bonus compensation was $35,675. The trial court awarded 76 percent ($27,113) to Husband and 24 percent ($8,562) to Wife.

- 30 -

As discussed above, Wife asserts that the record contains no evidence to support a 22 percent tax liability, and Husband points us to none. We observe that Wife did not contribute to the acquisition of this asset, and, notwithstanding proof of a definitive amount, a tax liability will attach to the asset. In light of the totality of this record, we reverse the trial court's division of Husband's leave/bonus compensation and award it to Husband in total.

## Husband's DROP Account

We next consider Husband's DROP account. The trial court found that the gross value of the DROP account was $131,828 and determined that the equity value was $102,824. The trial court awarded 76 percent of the DROP ($78,146) to Husband and 24 percent ($24,678) to Wife. As discussed above, however, the proof reasonably supports a reduction of 20 percent in consideration of the tax consequences associated with this asset. Accordingly, we turn to the equitable division of this asset in light of the circumstances in this case.

As discussed above, the DROP offers Memphis employees, who have paid into the City's pension plan for at least 25 years, the opportunity to defer retirement for a maximum of three years. Pension amounts that the employee would have received had he/she retired are deposited into a DROP account during the deferment period. At the June 2020 trial of this matter, the Pension Coordinator for the City of Memphis testified that participation in the DROP program requires the participant to retire in one, two, or three years and that Husband entered the DROP plan in July 2015. She testified that, although the decision to enter the DROP is irrevocable, the City Council permitted a "freeze period," and Husband froze participation in the DROP in November 2015 and unfroze it in November 2017. She further testified that the funds paid into the DROP account constitute "the (deferred) pension money" and that "instead of going to the employee, because they're deferring it, it's actually set aside for them" in the DROP account. She also testified that participation in the DROP did not impact Husband's expected post-retirement pension.

The DROP Freeze Cancellation Form contained in the record provides that, during the freeze period, the City's payments to the DROP account were suspended, and Husband was required to make employee contributions to the City's pension. Husband earned creditable service as an employee during the freeze period, however. When the freeze period ended, the City's payments to the DROP account were based on a recalculation of Husband's pension benefits in light of the additional creditable service time.

As Husband asserts, although the DROP account was established during the course of the marriage, most of the years of service required to participate in the program accrued prior to the marriage. However, the DROP account essentially served as an interest-bearing savings account into which the City deposited Husband's deferred pension amounts while Husband continued to receive his regular salary. In return, Husband agreed to retire in July

- 31 -

2020. Additionally, Husband was not required to pay into the City's pension account while actively participating in the DROP, but he gained additional creditable service during the "freeze" period which impacted his pension benefits.

Under the circumstances of this case and in light of the foregoing, we affirm the trial court's division of Husband's DROP account awarding 24 percent of the total account to Wife. The award to Wife shall be reduced by 20 percent in consideration of the tax consequences associated with the account that are supported by proof in the record. The remainder of the DROP account is awarded to Husband.

Upon review of the record and in consideration of the factors set-forth in section 36-4-121, including the duration of this marriage; the parties pensions, savings, and checking accounts; the parties' separate property, including Wife's Brittany Lane property; the value of the vehicle awarded to each party; the award to Wife of the marital Memphis residence; the award to Husband of his leave/bonus compensation; Husband's mandatory retirement; the parties' respective earning capacities; the parties' respective contributions to the marriage; and the parties' contributions to the acquisition of the marital estate, we are satisfied that the foregoing modified division of marital property is equitable under the circumstances.

### B. Bias and Dismissal of Wife's Tort Claims

Finally, we turn to Wife's assertion that the trial court exhibited bias against her which impacted its disposition of Wife's interspousal tort claims. Wife asserts that she overheard a conversation during a lunch break in the course of the June 2020 proceedings in which the trial judge defended his treatment of a courtroom clerk by stating "loudly and forcefully" that "Pam Stark is doing everything she can to delay this." She submits,

> [Wife] immediately placed this on the record when the court returned from recess. Though the court made comments explaining his conversation; however, it did not deny any of the statements [Wife] stated she had heard. The court denied bias and indicated it could impartially adjudicate the issues. However, the same day the court prohibited [Wife] from attempting to impeach [Husband's] credibility indicating that it had already made credibility determinations. Given this was cross-examination of [Husband], the traditional time during which impeachment occurs, it seemed apparent which way those determinations had fallen. Wife did not file a written motion, as the court had already ruled from the bench and the trial was well underway. After trial, there was nothing for the judge to recuse himself from. However, once the court indicated that it could hear the Contempt Petition it had previously stayed, [Wife] filed a written motion . . . prior to the court entering the Final Decree of Divorce.

- 32 -

(Wife's citations to the record omitted.)

Wife asserts that "[t]he rulings at trial, taken in context with comments the court made concerning [Wife], establish a bias against [Wife] which prevented her from having her tort action heard before a neutral tribunal." She submits that "[t]he court made it blatantly clear from the onset that it viewed [Wife's] tort claims at best as part and parcel with the divorce." She relies on *Kemp v. Kemp*, 723 S.W.2d 138 (Tenn. Ct. App. 1986), for the proposition that "[t]hough case law indicates that potential overlap requires [an] interspousal tort action to either be tried prior to or simultaneous with any pending divorce action, that does not make them one action." Wife asserts that, with respect to the adjudication of her tort claims, the trial court prevented her from impeaching Husband's credibility, prohibited her from introducing relevant evidence and calling police officers as witnesses, and "discredited all of [Wife's] testimony."

Wife also points to the trial court's rulings related to the 2019 order of contempt as further evidence of bias. In her brief, Wife asserts:

> Since [Wife's] public comments concerning MPD were brought to the court's attention, interactions have been tumultuous. The court has made clear that it neither approved of [Wife] or her comments. While the court's approval is certainly not required, the court's disapproval has played out through its rulings.
> 1) The court used [Wife's] allegations of domestic assault to issue an order of protection against her, requiring that depositions be taken at the courthouse in the presence of a bailiff.
> 2) The court found [Wife] violated the mandatory injunction by subpoenaing [Husband's] supervisor, a person with knowledge of the case, for a deposition.
> 3) The court granted a restraining order clearly violative of the United States Constitution and Tennessee Constitution.
> 4) The court held [Wife] in contempt without any procedural due process.
> 5) The court has repeatedly mischaracterized [Husband's] actions on February 7, 2019.
> 6) The court entertained ex parte communications with opposing counsel and set the case for trial in [Wife's] absence.

(Wife's citations to the record omitted.)

Wife submits that, because the courtroom was closed due to COVID pandemic restrictions, she "was alone in the seemingly hostile environment." She asserts that her tort claims "turn mainly on credibility issues" and that "the appearance of bias renders the dismissal of these actions suspect." Wife relies on Rule 42 of the Tennessee Rules of

Criminal Procedure and *Cook v. State*, 606 S.W.3d 247 (Tenn. 2020), in support of her argument that bias and/or the appearance of bias mandated recusal in this case. She contends that "a reasonable person hearing [the trial court's] comments would not have been surprised by the outcome of her case." She also submits that the trial court's second order on contempt in September 2021 "add[s] insult to injury."

Insofar as Wife relies on events considered on appeal of the trial court's March 2019 order on contempt and May 2019 order denying her first motion to recuse, those matters are not before us here. We addressed the trial court's denial of Wife's first motion to recuse in *Stark v. Stark*, No. W2019-00901-COA-T10B-CV, 2019 WL 2515925 (Tenn. Ct. App. 2019) ("*Stark I*"), and we will not revisit that issue here. Additionally, the provisions of the Tennessee Code of Judicial Conduct Rule 2.11 and the case law governing the recusal based on bias were fully set-forth in *Stark I*, and we see no reason to repeat that analysis here.

In *Stark I*, we observed:

> Rather than take issue with the trial court's substantive rulings, Wife contends that the trial court's "rulings have repeatedly exceeded the relief sought by opposing counsel and create an appearance of both bias and prejudice which require his recusal." Wife also asserts that the trial court's decisions show that he has prejudged the issues remaining in the case. As an initial matter, we note that throughout her petition for recusal appeal, Wife takes issue with several inferences and implications that she asserts are evident from the trial court's rulings.

*Stark I*, 2019 WL 2515925, at *8.

Wife makes similar arguments here. Wife contends that the trial court's statement that Wife was "doing everything she can to delay this," combined with the court's rulings as a whole, created an appearance of bias. Wife does not ask us to review any substantive ruling, finding of fact or conclusion of law by the trial court. She did not raise dismissal of her tort claims as an issue for review in her Statement of the Issues. She asserts that the trial court was biased against her and that her tort claims were not heard by a neutral tribunal. The gravamen of Wife's argument, as we perceive it, is that the trial court erred in denying her second motion to recuse.

As we noted in *Stark I*, a trial court's "unfavorable impression of a party[,]" standing alone, is not "evidence of impermissible prejudgment." *Id.* at *10. Further, "even where a trial judge actually develops a bias from in-court interactions, such a bias must be so pervasive as to deny the litigant the right to a fair trial to warrant recusal." *Id.* (citation omitted). Moreover, "[i]n general, a trial court's unfavorable or even erroneous rulings are insufficient to show bias." *Id.* at *11.

- 34 -

Notwithstanding the comments made by the trial judge to his clerk, the transcript contains no evidence to demonstrate bias. The trial court permitted Wife leeway to call witnesses via Zoom and, despite the pandemic, held lengthy hearings. Although the trial court limited Wife with respect to questions it found irrelevant or redundant, Wife had ample opportunity to impeach Husband over the course of the six-day hearing of this matter.

To the extent that Wife relies on *Kemp v. Kemp* for the proposition that the trial court erred by not treating her divorce complaint and tort claims as separate and distinct proceedings, that reliance is misplaced. In *Kemp*, this Court held that the plaintiff's tort action against her former husband was bared by the doctrine of *res judicata* where "the facts underlying the domestic altercation were examined in a [prior] divorce action." *Kemp v. Kemp*, 723 S.W.2d 138, 139 (Tenn. Ct. App. 1986). The *Kemp* court observed: "The cause of action under which the plaintiff recovered medical expenses and lost wages in the divorce litigation technically was not the same—she sued for divorce—but, in effect, she prevailed on a tort claim." *Id*. As in the current case, the *Kemp* plaintiff/wife's claims for damages arising from spousal assault were heard within the divorce action.

Although the transcripts of the proceedings in this case reveal the trial court's occasional impatience and even irritation, such expressions "'are within the bounds of what imperfect men and women ... sometimes display.'" *In re Estate of Dorning*, No. M2020-00787-COA-T10B-CV, 2020 WL 3481538, at * 4 (quoting *Liteky v. U.S.*, 510 U.S. 540, 555-56 (1994)). Furthermore, we observe that the trial court's occasional impatience and irritation was directed at both parties during the course of the many hearings in this case. Moreover, despite Wife's assertion that the trial court "prohibited her from introducing any evidence which reflected poorly on [Husband,]" the record transmitted to this Court reflects otherwise.

In her brief, Wife asserts:

It is not difficult to understand why an impartial tribunal is pivotal to the concept of justice and faith in the judicial system. Judges after all are vested with the power to divest litigants of life, liberty and property. However, despite the universal recognition of this concept, it is often a right without much remedy. Trial courts are vested with broad discretionary power and presumption in the correctness of their rulings.

. . .

Thus, an appellant's fate is left to an argument that must be tempered to avoid any statements considered derogatory, a transcript which cannot reflect inflection, pitch, tone, volume or body language and judicial rulings which

are presumed correct. Even these are subject to rebuffs of "should expect to incur the wrath of the judge," or "every ruling by necessity involves some measure of bias" under a standard where "even, repeated and continuous erroneous rulings are insufficient" to show bias. Eldridge citing Wilson v. Wilson, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998)[.]

As Wife asserts, "the black robe is not a magic cape that removes the frailties of human nature." In this case, however, notwithstanding the trial court's comments to his clerk in a private conversation overheard by Wife, the record contains no evidence of impropriety. Even viewing the trial court's June 2020 comments together with the assertions made by Wife in her first motion to recuse, we find no evidence of bias. Therefore, we affirm the trial court's denial of Wife's second motion to recuse and its dismissal of Wife's tort claims. Wife's request for relief in the form of remand of her tort claims is denied.

## IV. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment dismissing Wife's claims of battery, intentional infliction of emotional distress, fraudulent inducement and/or promissory estoppel and/or unjust enrichment. The trial court's classification of the Brittany Lane property as marital property under the doctrine of transmutation is reversed. The Brittany Lane property is awarded to Wife as her separate property. We also reverse the trial court's classification and division of Husband's attorney's fees as marital debt, and its judgment ordering Wife to pay one-half of those fees. The remainder of the trial court's valuation and division of marital property is affirmed as modified, to wit:

Wife is awarded the Brittany Lane property in total as her separate property;
The parties are awarded the marital portion of their respective pensions, in total;
The parties are awarded their respective savings/checking accounts;
Wife is awarded the 2017 Jeep Renegade and Husband is awarded the 2011 Jeep Compass;
Wife is awarded the marital residence in Memphis, Tennessee, in total;
Husband is awarded his leave/bonus compensation, in total;
Wife is awarded 24 percent of Husband's DROP account. The pre-tax amount awarded to Wife from the DROP account will be reduced by 20 percent in consideration of Husband's tax liability as supported by the record. Except as provided with respect to the DROP account, any indebtedness, tax, insurance or other financial liability attached to an asset will be the responsibility of the party receiving that asset.

Husband's request for attorney's fees on appeal is denied. Costs on appeal are taxed one-half to the Appellee, Joe Edward Stark, and one-half to the Appellant, Pamela Diane

Stark, for all of which execution may issue if necessary. This matter is remanded to the trial court for entry of a judgment consistent with this Opinion. Further proceedings in the trial court, if any, are limited to those strictly necessary for entry of a judgment as provided herein.

_s/ Kenny Armstrong_
KENNY ARMSTRONG, JUDGE
